A05A2141. EHCA DUNWOODY, LLC v. DANIEL.
 (627 SE2d 830)

 RUFFIN, Chief Judge.
 Bonnie Daniel sued EHCA Dunwoody, LLC d/b/a Emory Dunwoody Medical Center and others (collectively "Emory" or "the hospital") for medical malpractice. The case proceeded to trial, and a jury found in favor of Daniel. Emory subsequently moved for judgment notwithstanding the verdict ("judgment n.o.v.") or, in the alternative, for a new trial. The trial court denied Emory's motion, and Emory appeals. For reasons that follow, we affirm.

 1. A party is entitled to a judgment n.o.v. "only where there is no conflict as to any material issue and the evidence introduced, including all reasonable deductions from that evidence, is such that only one reasonable conclusion may be drawn as to the proper judgment."[1] If *any* evidence supports the jury's verdict, a judgment n.o.v. should not be granted.[2]

 In her complaint, Daniel alleged that she was admitted to the hospital on August 22, 2000. Daniel informed Emory prior to her admission that she was allergic to latex. Nevertheless, a latex catheter was inserted into Daniel while she was under Emory's care. Asserting that she suffered an adverse reaction to the catheter, Daniel sued for malpractice.

 Prior to trial, Daniel moved for partial summary judgment on the issue of liability. The trial court granted the motion as to duty and breach, finding that Emory breached the standard of care by using a latex catheter. It further found, however, that questions of fact

---

[1] *Brown v. DeKalb Med. Center*, 225 Ga. App. 4, 5 (1) (482 SE2d 511) (1997).
[2] See id.

remained as to whether this breach proximately caused injury to Daniel and whether Daniel suffered any damages. Accordingly, the case proceeded to trial on the issues of causation and damages.

Construed favorably to the jury's verdict,[3] the trial evidence showed that Daniel developed interstitial cystitis ("IC"), a chronic bladder disorder, after her treatment at Emory. Daniel testified that the night following her discharge, she began retaining urine and was very uncomfortable. The next morning, she went to the emergency room at another hospital seeking relief. According to Daniel, the emergency room doctor — Clarence Carr — told her that she had experienced an allergic reaction to the latex catheter that caused her urethra to close. The emergency room medical staff used a silicone catheter to empty her bladder.

Over the next few months, Daniel suffered from frequent and urgent urination, as well as bladder pain. In January 2001, the pain increased to an acute "stabbing" sensation in her bladder, and she again went to the emergency room, where she received medication. After that visit, the pain and problems with her bladder continued. A urogynecologist eventually diagnosed her with IC, and the Social Security Administration adjudged her disabled.

Dr. Mickey Karram testified on behalf of Daniel as an expert in the fields of obstetrics, gynecology, and urogynecology. According to Dr. Karram, IC is an "enigma" because doctors do not know what causes it or how best to treat it. He explained, however, that the disorder usually begins with "some sort of trauma[ ] or some sort of event[ ] . . . that makes the inside of the bladder . . . very sensitive." The lining of the bladder corrodes, allowing urine to touch the underlying layers, which causes extreme pain. Once this occurs, the bladder becomes irritated and essentially "nonfunctional."

Dr. Karram testified that Daniel suffers from severe IC. He further stated that, in his opinion, the use of the latex catheter at Emory caused Daniel's condition. As Dr. Karram explained, although no "significant, well-known ideologic factor . . . occurs in every patient that has" IC,

> we do know that a traumatic event to the bladder — and certainly something like [use of the latex catheter in a patient with a latex allergy] — could provoke the patient into a state of interstitial cystitis; but the . . . simple thing in my mind, that makes this very clear, is that she didn't have any

---

[3] See *Aldworth Co. v. England*, 276 Ga. App. 31, 37 (622 SE2d 367) (2005) (" 'After the rendition of a verdict, all the evidence and every presumption and inference arising therefrom, must be construed most favorably towards upholding the verdict.' ").

bladder pain [or] problems before this happened. And it all started after [the latex catheter was used]. And . . . you put that together with the state she's in now, . . . it's pretty clear to me.[4]

Asked about the relationship between allergies and IC, Dr. Karram testified that, given the available data, "it's pretty clear that the autoimmune system and allergic reactions and histamine release . . . play[ ] into the development of [IC]." He admitted, however, that no research has specifically studied a connection between IC and latex allergies because such relationship cannot be "scientifically test[ed]" since "nobody would agree to have that research done on them." He further agreed on cross-examination that "[n]obody can be a hundred percent sure what causes this disease in general." But he emphasized that "when you have a history like [Daniel's] that involves definitive, traumatic events of the bladder that occurred, . . . it's pretty clear . . . that was the culprit."[5]

On appeal, Emory claims that the trial court erred in denying its motion for judgment n.o.v. because "Daniel failed to prove that [Emory's] conduct was the proximate cause of her interstitial cystitis." In Emory's view, Dr. Karram's testimony constituted mere conjecture and speculation, which cannot establish causation.

To recover in a medical malpractice action, a claimant must show by a preponderance of the evidence that the defendant's negligence "either proximately caused or contributed to cause [the claimant] harm."[6] Because this issue generally is beyond the ken of the average juror, the claimant must present expert testimony to prove causation.[7] And the expert must offer the jury a realistic assessment of the likelihood that the defendant's negligence caused the injury.[8] As our Supreme Court recently stated:

Perhaps in the world of medicine nothing is absolutely certain. Nevertheless, it is the intent of our law that if the plaintiff's medical expert cannot form an opinion with sufficient certainty so as to make a medical judgment, there is nothing on the record with which a jury can make a decision with sufficient certainty so as to make a legal judgment.[9]

---

[4] (Punctuation omitted.)

[5] (Punctuation omitted.)

[6] (Punctuation omitted.) *Zwiren v. Thompson*, 276 Ga. 498, 500 (578 SE2d 862) (2003).

[7] See id.

[8] See id. at 500-501.

[9] (Punctuation omitted.) Id. at 501.

Although absolute certainty is not required, the expert's testimony has to provide a causal connection that is more than chance or speculation.[10] The testimony "must show as an evidentiary threshold that the expert's opinion regarding causation is based, at the least, on the determination that 'there was a reasonable probability that the negligence caused the injury.' "[11] In other words, "Georgia case law requires . . . that an expert state an opinion regarding proximate causation in terms stronger than that of medical possibility, i.e., reasonable medical probability or reasonable medical certainty."[12]

Arguing that Dr. Karram's testimony is nothing more than speculation, Emory points to his admission that the causes of IC are unknown and that no research has linked IC to latex allergies. Dr. Karram also testified, however, that IC usually occurs after some trauma — such as an allergic reaction — in the bladder. And, given all of the factors surrounding Daniel's condition, including that she did not suffer from IC prior to insertion of the latex catheter, Dr. Karram concluded that, to a reasonable degree of medical certainty, the latex exposure caused the condition. Such testimony cannot be dismissed as speculation.[13]

Emory further argues that causation is not established merely by using "the 'magic words' 'reasonable degree of medical certainty.' " But Dr. Karram did not simply recite the "magic words." As required, he provided testimony about the reasonable probability Daniel's injury was caused by the latex catheter, stating that, given the evidence, "it's pretty clear" the latex exposure led to the harm.

Emory also claims that Dr. Karram's opinion was based on a "temporal relationship" between the negligence and the injury, which, according to Emory, is insufficient to establish causation. But the cases relied upon by Emory to support this claim do not involve expert testimony.[14] Moreover, even if a temporal relationship alone cannot support an expert's causation testimony, we cannot agree that Dr.

---

[10] See id.

[11] Id.

[12] Id. at 503.

[13] See *Wasdin v. Mager*, 274 Ga. App. 885, 889 (2) (619 SE2d 384) (2005) (claimant presented sufficient evidence of causation through expert testimony that, to a reasonable degree of medical certainty, defendant's negligence injured claimant); *Sinkfield v. Oh*, 229 Ga. App. 883, 887 (2) (495 SE2d 94) (1997) ("[T]he fact that [the plaintiff's expert] was not able to 'conclusively' testify as to the exact cause of the [plaintiff's] miscarriage does not, without more, prove the absence of proximate causation especially when considered in light of her testimony as a whole.").

[14] See *Cherokee County Hosp. Auth. v. Beaver*, 179 Ga. App. 200 (345 SE2d 904) (1986); *Akins v. Federated Mut. &c. Ins. Co.*, 108 Ga. App. 872 (134 SE2d 854) (1964); *Payne v. Chandler*, 41 Ga. App. 385 (153 SE 96) (1930).

Karram's opinion is based *solely* on such relationship. On the contrary, he testified that IC develops following a traumatic event to the bladder, as occurred in this case. He also testified that, given the available data, "it's pretty clear" allergic reactions can trigger IC.[15]

The record shows that Daniel presented some evidence of causation. Accordingly, the trial court properly denied Emory's motion for judgment n.o.v.[16]

2. Emory also argues that, even if it is not entitled to judgment as a matter of law, the trial court should have granted its motion for new trial because improper hearsay evidence was admitted at trial. It specifically complains about three types of evidence: (1) medical narratives from two of Daniel's treating physicians; (2) hearsay medical records; and (3) oral statements made to Daniel by treating physicians who did not testify at trial. On appeal, Daniel does not seriously challenge Emory's claim that at least *some* of this evidence was inadmissible hearsay. Rather, she argues that even if the trial court erred, admission of the evidence was harmless. We agree.

(a) *Medical narratives.* Over Emory's objection, the trial court admitted into evidence a letter from Dr. Clarence Carr, the emergency room physician who treated Daniel the morning after her discharge from Emory, and Dr. Mark McClain, a psychiatrist. The Carr letter draws a connection between the urinary retention experienced by Daniel at the time of her emergency room visit and Emory's use of the latex catheter. The McClain letter states that Dr. McClain has treated Daniel since September 2002 for "major depressive disorder, recurrent, severe; dysthymia; generalized anxiety disorder; [and] panic disorder with agoraphobia." According to Dr. McClain, the chronic pain associated with IC exacerbates the symptoms of Daniel's psychiatric condition. The letter states: "[T]he correlation between her pain exacerbations and the exacerbation of psychiatric symptoms has been clear."

Emory argues that Dr. Carr's letter "was the only proffered evidence that suggested a link between Ms. Daniel's urinary retention and her exposure to latex." But Daniel presented at trial the video deposition of Dr. Winn Walcott, an allergist and immunologist. Dr. Walcott testified that Daniel's urine retention (1) was a reaction

---

[15] Although Dr. Karram agreed on cross-examination that the temporal relationship between the onset of symptoms and the latex exposure formed the basis for his opinion, a close reading of his entire testimony shows that these other factors contributed to his ultimate conclusion.

[16] See *Wasdin,* supra; *Bhansali v. Moncada,* 275 Ga. App. 221, 226 (1) (c) (620 SE2d 404) (2005); *Sinkfield,* supra. Cf. *Cannon v. Jeffries,* 250 Ga. App. 371, 373 (1) (551 SE2d 777) (2001) (expert's testimony insufficient to establish causation where evidence showed that neither expert nor anyone else could establish to a reasonable degree of medical certainty what caused claimant's injury).

to the latex catheter, (2) was symptomatic of latex exposure, and (3) supported his opinion that Daniel is, in fact, allergic to latex.

In our view, Dr. Carr's opinion letter linking Daniel's urinary retention to the latex catheter is cumulative of Dr. Walcott's testimony, rendering any error in its admission harmless.[17] Although Emory notes that, on cross-examination, Dr. Walcott stated that he would defer to Daniel's "treating surgeon as to the cause of her urinary retention," the fact remains that Dr. Walcott drew a link between such retention and the latex exposure. Moreover, Dr. Karram testified that, in his opinion, the latex exposure caused Daniel's bladder problems and, ultimately, IC. Thus, the admission of Dr. Carr's letter does not constitute reversible error.[18]

Similarly, the admission of Dr. McClain's letter does not require reversal. Emory asserts that the letter provides the only connection between Daniel's psychiatric symptoms and the latex exposure. The letter, however, draws a correlation between those symptoms and Daniel's IC, not the latex exposure. And other evidence in the record shows such a link. Specifically, both Dr. Karram and Emory's expert witness testified that IC is a life-changing disease that affects quality of life every day. Dr. Karram also reported that IC patients have committed suicide.

Moreover, Daniel testified about the effect her condition has had on her mental health, stating that IC pain has caused her to suffer from depression, anxiety, and feelings of suicide. Daniel further testified that Dr. McClain has treated her for these symptoms. The trial court also admitted into evidence a pain journal Daniel began keeping in January 2002, which describes how she felt both physically and emotionally each day. The entries in her journal include references to depression and panic attacks, as well as suicidal thoughts. Finally, Daniel's daughter testified that Daniel does not take part in many of the activities outside the home that she engaged in prior to August 2000.

Given this extensive evidence showing a link between Daniel's IC condition and her mental health problems, we cannot find that the brief, one page letter from Dr. McClain harmed Emory. Accordingly, even if the trial court erred in admitting the letter, that error provides no basis for a new trial.[19]

---

[17] See *Tice v. Cole*, 246 Ga. App. 135, 137-138 (1) (b) (537 SE2d 713) (2000).

[18] See id.; *Harris v. Tatum*, 216 Ga. App. 607, 611 (2) (455 SE2d 124) (1995).

[19] See *Brewer v. Williams*, 167 Ga. App. 151, 153 (6) (305 SE2d 891) (1983) (" 'Inadmissible hearsay which is received over objection does not require a new trial if it appears that the evidence could not have affected the verdict because other evidence by a witness with immediate and personal knowledge is sufficient to establish the fact in question.' "); *Seaboard Coast Line R. Co. v. Duncan*, 123 Ga. App. 479, 480 (1) (181 SE2d 535) (1971) ("The erroneous

(b) *Medical records.* Emory also argues that the trial court erred in admitting the hearsay records of a psychiatrist, a pain management doctor, and a psychologist who all treated Daniel, but did not testify at trial. According to Emory, the records contain details about treatment Daniel received that cannot be found elsewhere in the trial evidence. It also argues that the records reflect "opinions, evaluations, and diagnoses" of nontestifying medical providers.

But Emory has made no effort to show — or even argue — how the admission of this evidence harmed it. For example, it has not demonstrated that the records offered unique evidence not found elsewhere regarding the cause of Daniel's IC condition.[20] We recognize that the records provide information about her treatment and thus potentially relate to damages. As noted above, however, Daniel testified that these individuals treated her, and her testimony and pain journal related the pain caused by IC, as well as its significant effect on her mental health. Under these circumstances, we cannot conclude that the admission of these records likely contributed to the verdict or harmed Emory.[21]

(c) *Statements made by physicians.* Emory claims that the trial court improperly allowed Daniel to testify about hearsay statements made to her by her physicians. It points first to Daniel's testimony that Dr. Carr told her during her first emergency room visit that she had experienced an allergic reaction. As found in Division 2 (a), however, the record contains other evidence that an allergic reaction caused the urinary retention that prompted Daniel to visit the emergency room. Even assuming error, therefore, we fail to see how the admission of this testimony harmed Emory.[22]

Second, Emory argues that Daniel should not have been allowed to testify about statements made by Dr. Kemp, an allergist. Daniel testified that Dr. Kemp tested her for latex allergy. According to Daniel, Dr. Kemp told her that although the allergy tests were inconclusive, those results did not rule out a latex allergy. Regardless of whether this testimony constituted hearsay, its admission was

---

admission of evidence over objection will not require reversal if it appears that the evidence could not have affected the verdict rendered.").

[20] Compare *In the Interest of C. D. E.*, 248 Ga. App. 756, 764 (2) (546 SE2d 837) (2001) (in child custody case, trial court erred in relying heavily on report of psychologist who did not testify at bench trial); *Giles v. Taylor*, 166 Ga. App. 563 (1) (305 SE2d 154) (1983) (admission of medical records prepared by doctors who did not testify constituted reversible error because the records, "to a large extent," tended to prove the plaintiff's case).

[21] *Wilbanks v. State*, 251 Ga. App. 248, 257 (6) (554 SE2d 248) (2001) (where it is highly probable that the admission of hearsay did not contribute to the verdict, that admission is harmless); *Wolfson v. Rumble*, 121 Ga. App. 549 (1) (174 SE2d 469) (1970) (" 'The admission of hearsay or immaterial evidence without harmful effect to the complaining party is not ground for a new trial.' ").

[22] See *Tice*, supra; *Harris*, supra.

harmless. Emory's own allergy expert testified that latex allergy tests can produce "false negative" results. Dr. Walcott similarly testified that such tests are "frequently falsely negative," but that a negative result does not mean that a person has no latex allergy. Accordingly, it is highly unlikely that Daniel's testimony regarding Dr. Kemp impacted the verdict.[23]

*Judgment affirmed. Johnson, P. J., and Barnes, J., concur.*

DECIDED FEBRUARY 28, 2006 — 

*Alston & Bird, James C. Grant, Derin B. Dickerson*, for appellant.

*Brent S. Hudspeth, Christopher J. McFadden*, for appellee.

