A07A1060. MCG HEALTH, INC. v. BARTON.
A07A1061. BOARD OF REGENTS OF THE UNIVERSITY SYSTEM OF GEORGIA v. BARTON.
(647 SE2d 81)

BLACKBURN, Presiding Judge.

Craig Barton, a minor, by and through his parents Brady Barton and Barbara Barton, as natural guardians and next friends, sued MCG Health, Inc. ("MCGHI") and the Board of Regents of the

University System of Georgia d/b/a Medical College of Georgia ("the Board"), alleging that the defendants' professional negligence caused him personal injury. In Case No. A07A1060, MCGHI appeals the trial court's denial of its motion for summary judgment, arguing that Barton failed to establish that any of defendants' actions proximately caused his injury or, in the alternative, that the intervening acts by the Board's physicians precluded any recovery against MCGHI. In Case No. A07A1061, the Board appeals the trial court's denial of its motion to exclude the testimony of Barton's medical expert and for summary judgment, arguing that Barton's expert was not qualified to render opinions regarding whether the Board's physicians deviated from the proper standard of medical care, and that Barton had failed to provide any evidence that the Board's physicians proximately caused his injury. Because these two appeals involve the same set of facts and principles of law, we consolidate them for review. For the reasons set forth below, we affirm the trial court's denial of both MCGHI's and the Board's motions for summary judgment.

Summary judgment is proper when there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law. OCGA § 9-11-56 (c); *Britt v. Kelly & Picerne, Inc.*[1] "On appeal from the grant or denial of a motion for summary judgment, we review the evidence de novo, and all reasonable conclusions and inferences drawn from the evidence are construed in the light most favorable to the nonmovant." *McCaskill v. Carillo.*[2]

So construed, the evidence shows that at approximately 5:00 p.m. on December 29, 2003, 16-year-old Craig Barton was playing basketball with some friends on his driveway outside of his home. While playing, one of Barton's friends collided with Barton's left leg, which caused that leg to collapse into his right leg. Barton immediately felt a sharp pain in his testicles and had to stop playing. At approximately 10:00 p.m., Barton was still in pain and also had swelling in his testicles, so his father took him to Eisenhower Army Medical Center ("EAMC" a/k/a DDEAMC). At EAMC, Barton was told that he needed to be examined by a urologist and undergo an ultrasound test, but that the examinations would have to be performed at the Medical College of Georgia Hospital ("MCG"). Consequently, EAMC personnel contacted MCG's Emergency Communication Center ("ECC") specialist, who in turn contacted the chief of urology at MCG. Based on Barton's injury, the chief of urology informed EAMC that Barton would be accepted for admission and evaluated by a urologist upon his arrival at MCG's emergency

[1] *Britt v. Kelly & Picerne, Inc.*, 258 Ga. App. 843 (575 SE2d 732) (2002).
[2] *McCaskill v. Carillo*, 263 Ga. App. 890 (589 SE2d 582) (2003).

department. To facilitate this admission, the MCG ECC specialist prepared an ECC referral form, which normally would have been delivered immediately to the emergency department's triage nurse.

Barton and his father arrived at MCG at approximately 12:15 a.m. Upon their arrival, they informed MCG personnel that a referral had been coordinated between EAMC and the ECC specialist on duty, but they were nevertheless sent to the waiting room. Barton was seen by the MCG triage nurse at 1:47 a.m. However, the triage nurse had not received the ECC referral form and was thus unaware that Barton had already been accepted for admission by the chief of urology. Consequently, Barton was classified as "non-urgent" and was again sent back to the waiting room. At 3:05 a.m., Barton was examined by the MCG emergency department's attending physician, who also had not been made aware that Barton had been accepted for admission by the chief of urology. Based on his examination of Barton, the attending physician offered a diagnosis of either testicular fracture, testicular mass,[3] or testicular torsion[4] and ordered urology to be called immediately.

Some time after 4:00 a.m., a urology resident examined Barton, and although she did not rule out torsion, she believed the more likely diagnosis to be testicular mass. Shortly thereafter, the urology resident called the attending urologist at his home to discuss her diagnosis. Without examining Barton, the attending urologist agreed with the resident's assessment and decided that because no ultrasound technician was currently available, Barton should be admitted to the hospital so that he could undergo an ultrasound later that morning once an ultrasound technician arrived. The ultrasound was conducted at 8:15 a.m. and revealed that there was no blood flow to Barton's left testicle. Based on the ultrasound, the attending urologist performed scrotal exploration surgery at 10:10 a.m., at which time, Barton's left testicle was found to be necrotic and was removed. The attending urologist's post-operative diagnosis of Barton's injury was left testicular torsion. The initial pathology report also noted that Barton's injury was consistent with torsion. However, following a urology conference discussing the case, the pathology report was amended to conclude that Barton's injury was more consistent with testicular trauma.

Through his parents, Barton filed a malpractice action against the Board and MCGHI, as employers of the treating physicians and

---

[3] Testicular mass is the term for neoplasm or cancer in the testicle.

[4] Testicular torsion is the twisting of the testicle and the spermatic cord that provides the blood supply to the testicle.

hospital personnel respectively. His complaint alleged that the hospital personnel negligently delayed his admission, and that the physicians negligently delayed necessary medical treatment, resulting in the loss of his testicle. Attached to the complaint was the affidavit of Barton's medical expert, a licensed emergency room physician, who testified that the urologists' failure to properly evaluate Barton's injury "was a departure from the degree of care and skill ordinarily employed by the medical profession under similar conditions and like surrounding circumstances."

Following discovery, MCGHI moved for summary judgment, and the Board moved for the exclusion of the medical expert's testimony and the dismissal of Barton's complaint or, in the alternative, for summary judgment. The trial court denied both motions and certified the case for immediate review. We granted both MCGHI's and the Board's applications for interlocutory appeal.

## Case No. A07A1061

1. We first address Case No. A07A1061, in which the Board contends that the trial court erred in denying its motion to exclude the testimony of Barton's medical expert. Specifically, the Board argues that under OCGA § 24-9-67.1 (c) (2), Barton's medical expert's testimony should have been excluded because as "a family practitioner with emergency medical treatment experience, [he] has no surgical or urological experience that would qualify him to render an opinion as to whether [the Board's urologists] exercised the requisite urological standard of care in a surgical setting." We disagree.

"The issue of the admissibility or exclusion of expert testimony rests in the broad discretion of the court, and consequently, the trial court's ruling thereon cannot be reversed absent an abuse of discretion."[5] *Cotten v. Phillips*, 280 Ga. App. 280, 283 (633 SE2d 655) (2006). OCGA § 24-9-67.1 (c) (2), the statute at issue here, reads in relevant part:

[I]n professional malpractice actions, the opinions of an expert, who is otherwise qualified as to the acceptable standard of conduct of the professional whose conduct is at

---

[5] Citing *Abramson v. Williams*, 281 Ga. App. 617 (636 SE2d 765) (2006), the Board contends that the trial court's application of OCGA § 24-9-67.1 (c) (2) in this matter is subject to de novo review. This contention is incorrect. *Abramson* involved the application of that statute in the context of reviewing the trial court's denial of a motion to dismiss for failure to state a claim (OCGA § 9-11-12 (b) (6)) due to an insufficient affidavit under OCGA § 9-11-9.1. Id. at 618. See *Hewett v. Kalish*, 264 Ga. 183, 185 (1) (442 SE2d 233) (1994). Here, the Board's motion to exclude the testimony of Barton's expert requested that summary judgment be granted. See *Cotten v. Phillips*, 280 Ga. App. 280, 283 (633 SE2d 655) (2006).

> issue, shall be admissible only if, at the time the act or omission is alleged to have occurred, such expert . . . [,] [i]n the case of a medical malpractice action, had *actual professional knowledge and experience in the area of practice or specialty in which the opinion is to be given.*

(Emphasis supplied.) In *Cotten,* this Court held that the statute's plain language "contemplates that the expert may very well have a different area of practice than the defendant doctor. Under the statute, it is the expert's qualifications, rather than the defendant doctor's specialty or area of practice, that controls whether the trial court should allow the expert's testimony." *Cotten,* supra, 280 Ga. App. at 285. See *Canas v. Al-Jabi.*[6] In addition, whether a plaintiff's expert has "actual professional knowledge and experience in the area of practice or specialty *in which the opinion is to be given"* under subsection (c) (2), is determined "not by the apparent expertise of the treating physician, but rather by the allegations of the complaint concerning plaintiff's injury." (Punctuation omitted; emphasis in original.) *Mays v. Ellis.*[7] See *Abramson v. Williams,* 281 Ga. App. 617, 619 (636 SE2d 765) (2006).

In this matter, Barton's complaint does not allege that the Board's urologists negligently performed the exploratory surgery or that they negligently removed his testicle contrary to urological standards of care. Instead, Barton claims that hospital staff and the urologists negligently failed to timely evaluate and treat his injury, and that this delay resulted in the loss of his left testicle. In support of Barton's claims, his medical expert, a licensed physician with over 20 years of emergency room experience, including experience diagnosing testicular injuries, testified that the Board's urologists who treated Barton deviated from the proper standard of medical care by not taking more immediate measures to determine if Barton's injury was testicular torsion. Specifically, Barton's medical expert testified that because salvaging the testicle in torsion cases requires expedited treatment, patients such as Barton who present in the emergency room with acute scrotal pain must undergo either an ultrasound or exploratory surgery as quickly as possible to definitively rule out torsion from the diagnosis.

Thus, because under Barton's complaint the ultimate issues to be decided are whether the hospital staff and the Board's urologists committed malpractice by failing to timely evaluate Barton's injury, "the area of practice or specialty in which the opinion is to be given"

---

[6] *Canas v. Al-Jabi,* 282 Ga. App. 764, 795 (3) (c) (639 SE2d 494) (2006).
[7] *Mays v. Ellis,* 283 Ga. App. 195, 198 (1) (b) (641 SE2d 201) (2007).

in this case is an area of practice in which Barton's medical expert possessed the requisite knowledge and experience under OCGA § 24-9-67.1 (c) (2). See *Mays*, supra, 283 Ga. App. at 198-199 (1) (b); *Cotten*, supra, 280 Ga. App. at 287. Accordingly, the trial court did not abuse its discretion in denying the Board's motion to exclude the testimony of Barton's medical expert.

2. The Board also contends that even if the testimony of Barton's medical expert is admitted, the trial court nevertheless erred in denying summary judgment because Barton failed to present any evidence that the alleged deviations from the standard of medical care proximately caused his damages. We disagree.

"To recover in a medical malpractice case, a plaintiff must show not only a violation of the applicable medical standard of care but also that the purported violation or deviation from the proper standard of care is the proximate cause of the injury sustained." *Berrell v. Hamilton*.[8] "A mere showing of negligence without proof of causation is insufficient to withstand summary judgment." Id. Furthermore, "[m]edical causation must be proved to a reasonable degree of medical certainty and cannot be based on mere speculation." Id. In a medical malpractice case, causation must be established through expert testimony. *Zwiren v. Thompson*.[9] However, "[q]uestions regarding causation are peculiarly questions for the jury except in clear, plain, palpable and undisputed cases." (Punctuation omitted.) *Walker v. Giles*.[10]

Here, Barton's medical expert testified that if testicular torsion is part of the differential diagnosis following the clinical examination of a patient presenting with acute scrotal pain, the proper standard of care requires that either an ultrasound or exploratory surgery be conducted as soon as possible so that torsion can either be definitively ruled out or the injured testicle can be salvaged. The medical expert also testified that the chances for successfully salvaging the testicle decrease the longer treatment of the torsion is delayed, and that if torsion is not treated within 12 hours from the time the patient first began experiencing pain, the chances of salvaging the testicle become more remote.

The Board contends that the medical expert's testimony does not establish proximate cause, arguing that since Barton was not examined by the urologists until nearly 11 hours after his injury, even if exploratory surgery had been conducted immediately following that

---

[8] *Berrell v. Hamilton*, 260 Ga. App. 892, 896 (581 SE2d 398) (2003).

[9] *Zwiren v. Thompson*, 276 Ga. 498, 500 (578 SE2d 862) (2003).

[10] *Walker v. Giles*, 276 Ga. App. 632, 639 (1) (624 SE2d 191) (2005).

examination, such surgery would still not have occurred until approximately 12 hours after the injury and therefore too late for any realistic chance of salvaging Barton's testicle. However, the Board's own witness, the chief of urology at MCG, testified that there is a 50 percent chance of salvaging some testicular function up to 12 hours after an injury. Whether or not a genuine issue of fact has been created with regard to causation must be determined in light of the evidentiary record as a whole. See *Sinkfield v. Oh*.[11] Given these questions of fact regarding the efficacy of twelfth-hour surgery, the Board's argument that immediate post-examination surgery would not have increased the probability of salvaging Barton's testicle is "better made to a jury, not to an appellate court considering a summary judgment order." *Wasdin v. Mager*.[12] Accordingly, the trial court did not err in denying the Board's motion for summary judgment.

### Case No. A07A1060

3. In Case No. A07A1060, MCGHI similarly contends that the trial court erred in denying summary judgment, arguing that Barton failed to present any evidence that the alleged deviations from the proper standard of medical care proximately caused his damages. Specifically, MCGHI argues that Barton failed to show proximate cause because his medical expert could only speculate that Barton's testicle would have been salvageable if MCGHI staff had not delayed his evaluation and the Board's urologists had not delayed treatment. We disagree.

As we stated in Division 2, supra, genuine issues of fact remain as to whether the Board's urologists proximately caused Barton's damages. With regard to MCGHI's employees, Barton's medical expert testified that Barton would likely have been seen by a physician sooner after his arrival at MCG if MCGHI staff had not negligently misplaced the ECC form, which noted that his admission had already been approved by MCG's chief of urology. Additionally, his medical expert testified that the triage nurse deviated from proper standard of medical care by classifying Barton as "non-urgent" following her examination of him. Indeed, several of the Board's physicians agreed with the medical expert's assessment that the triage nurse had erred in her classification of Barton as "non-urgent." Barton's medical expert concluded that these deviations delayed Barton being seen by a physician, and that this delay led to the loss

[11] *Sinkfield v. Oh*, 229 Ga. App. 883, 886-887 (2) (495 SE2d 94) (1997).
[12] *Wasdin v. Mager*, 274 Ga. App. 885, 889 (2) (619 SE2d 384) (2005).

of his testicle. The fact that Barton's medical expert could not testify as to the exact point in time at which Barton's testicle became unsalvageable does not render his testimony mere speculation. See *EHCA Dunwoody, LLC v. Daniel;*[13] *Wasdin,* supra, 274 Ga. App. at 889 (2).

MCGHI further argues that proximate cause cannot be established because the undisputed evidence shows that Barton suffered testicular trauma, as opposed to torsion, and thus his testicle was unsalvageable within minutes of the initial injury. However, MCGHI's characterization of the trauma diagnosis as undisputed is belied by the record. Barton's medical expert testified that when a young man presents with acute scrotal pain, torsion must be part of the differential diagnosis until proven otherwise. The attending urologist who performed the exploratory surgery and removed Barton's testicle cited torsion as the diagnosis in his post-operative report. In addition, both the ultrasound report and the original pathology report stated that Barton's injury was consistent with testicular torsion. In fact, even the findings of the amended pathology report, which MCGHI cites in support of its argument that trauma was the correct diagnosis, are consistent with either trauma or torsion. Thus, questions of fact remained as to whether Barton's injury was testicular trauma or torsion. See *Sinkfield,* supra, 229 Ga. App. at 887 (2). Accordingly, the trial court did not err in denying MCGHI's motion for summary judgment on this issue.

4. MCGHI further contends that the trial court erred in denying its motion for summary judgment because the alleged negligence of the Board's urologists was an intervening act, which precluded recovery against MCGHI. Specifically, MCGHI argues that regardless of any alleged negligence on the part of its hospital employees, the decisions made by the Board's urologists to delay the ultrasound and any exploratory surgery, despite being fully aware of Barton's symptoms, was an intervening act of negligence constituting the sole proximate cause of the loss of Barton's testicle. We disagree.

"The requirement of proximate cause constitutes a limit on legal liability; it is a policy decision that, for a variety of reasons, e.g., intervening act, the defendant's conduct and the plaintiff's injury are too remote for the law to countenance recovery." (Punctuation omitted.) *Atlanta Obstetrics &c. v. Coleman.*[14]

> It is well settled that there can be no proximate cause where there has intervened between the act of the defendant and the injury to the plaintiff, an independent act (or omission)

---

[13] *EHCA Dunwoody, LLC v. Daniel,* 277 Ga. App. 783, 786 (1) (627 SE2d 830) (2006).
[14] *Atlanta Obstetrics &c. v. Coleman,* 260 Ga. 569 (398 SE2d 16) (1990).

of someone other than the defendant, which was not foreseeable by defendant, was not triggered by defendant's act and which was sufficient of itself to cause the injury.

(Punctuation omitted.) *McQuaig v. McLaughlin*.[15] See *Walker*, supra, 276 Ga. App. at 643 (2). However, it is equally well settled that "there may be more than one proximate cause of an injury in cases involving the concurrent negligence of several actors." (Punctuation omitted.) Id.

Here, Barton's medical expert testified that the negligence of the ECC specialist and the triage nurse in delaying Barton's admission and examination by a physician was a link in the chain of incorrect decisions made with regard to Barton's treatment. Barton's medical expert concluded that this delay, coupled with the urologists' delay in treating Barton, led to the loss of his testicle. In addition, the attending urologist, who performed the exploratory surgery, testified that he did not believe that Barton needed surgery immediately because of the delay that had already occurred between the time Barton first experienced symptoms and his examination by the resident urologist. "[T]he liability of a tortfeasor whose actions started the chain of events leading to the victim's injury is superseded and cut off only if there intervened between the act and the injury a distinct, successive, *unrelated*, efficient cause of the injury." (Punctuation omitted; emphasis in original.) *Walker*, supra, 276 Ga. App. at 644 (2). Whether or not the actions and inactions of MCGHI's hospital employees were distinct and unrelated to the actions of the Board's physicians is a question of fact best resolved by a jury. See *Coleman v. Atlanta Obstetrics &c.*[16] Moreover, genuine issues of fact also remain as to whether the actions of the Board's urologists could have reasonably been anticipated by MCGHI's employees as a consequence of the employees' own actions. See *Walker*, supra, 276 Ga. App. at 645 (2); *Coleman*, supra, 194 Ga. App. at 510 (1). Accordingly, the trial court did not err in denying MCGHI's motion for summary judgment.

*Judgments affirmed. Ruffin and Bernes, JJ., concur.*

DECIDED MAY 25, 2007 — 

---

[15] *McQuaig v. McLaughlin*, 211 Ga. App. 723, 726 (1) (b) (440 SE2d 499) (1994).

[16] *Coleman v. Atlanta Obstetrics &c.*, 194 Ga. App. 508, 511 (1) (390 SE2d 856) (1990), aff'd, *Atlanta Obstetrics &c. v. Coleman*, supra, 260 Ga. 569.

*Hull, Towill, Norman, Barrett & Salley, James S. V. Weston*, for appellant (case no. A07A1060).

*Thurbert E. Baker, Attorney General, Claude M. Sitton, Assistant Attorney General*, for appellant (case no. A07A1061).

*Burnside, Wall, Daniel, Ellison & Revell, Thomas R. Burnside III, Mark B. Williamson*, for appellee.