**THIRD DIVISION
ELLINGTON, P. J.,
BROWN and GOBEIL, JJ.**

**NOTICE: Motions for reconsideration must be *physically received* in our clerk's office within ten days of the date of decision to be deemed timely filed.
http://www.gaappeals.us/rules**

**November 1, 2018**

# In the Court of Appeals of Georgia

A18A0869. SWINT, et al. v. ALPHONSE, JR., et al.

GOBEIL, Judge.

During a prolonged surgical procedure, Fritz F. Swint suffered an injury that left him with nerve damage and limited use of his right hand. Swint and his wife Melissa thereafter filed suit in DeKalb County State Court against Paul Alphonse, Jr., M.D. (the surgeon), Tonya Mae, M.D. (the anesthesiologist), Pamela Roy, R. N. (the surgical nurse), and Midtown Urology, P.C. (Alphonse's employer), seeking damages arising from the defendants' alleged medical malpractice. The Swints now appeal from an order granting summary judgment in favor of Dr. Alphonse and Midtown Urology (collectively "Dr. Alphonse") on the Swints' claims.[1] The Swints assert that

[1] The current appeal represents the second time this case has appeared before this Court. Before granting summary judgment to Dr. Alphonse, the trial court granted summary judgment to Dr. Mae and Nurse Roy. The Swints appealed and we affirmed the trial court, finding that the testimony of the anesthesiology expert failed

in granting summary judgment, the trial court erred in its factual conclusion about the applicable standard of care and in finding that the Swints lacked sufficient evidence to create a question of fact on the causation element of their malpractice claims. We agree with the Swints, and we therefore reverse the trial court's order.

Summary judgment is proper when there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law. OCGA § 9-11-56 (c). "In reviewing a grant or denial of summary judgment, we owe no deference to the trial court's ruling and we review de novo both the evidence and the trial court's legal conclusions. Moreover, we construe the evidence and all inferences and conclusions arising therefrom most favorably toward the party opposing the motion." *Bryant v. Optima Int'l*, 339 Ga. App. 696, 696 (792 SE2d 489) (2016) (citations and punctuation omitted). In doing so, we bear in mind that "[t]he party opposing summary judgment is not required to produce evidence demanding judgment for it, but is only required to present evidence that raises a genuine issue of material fact." *Johnson v. Omondi*, 294 Ga. 74, 75 (751 SE2d 288) (2013) (citation and punctuation omitted).

---

to demonstrate that the negligence of either Dr. Mae or Nurse Roy caused Mr. Swint's injury. *Swint v. Mae*, 340 Ga. App. 480, 481 (798 SE2d 23) (2017) ("*Swint I*").

The underlying facts in this case are largely undisputed and are set forth in

*Swint I* as follows:

> [O]n December 3, 2009, Mr. Swint underwent a surgical procedure
> known as a robotic-assisted laparoscopic prostatectomy ("RALP")
> performed by Dr. Alphonse and proctored by Dr. Raymond Pak ("Dr.
> Pak").[2] Dr. Mae, M.D. was the attending anesthesiologist and Nurse
> Roy was the circulating nurse during the surgery. The RALP procedure
> required Mr. Swint to be positioned in the lithotomy in a steep
> Trendelenburg[3] position, with his left and right arms tucked to his side.
> Dr. Alphonse and Dr. Pak positioned Mr. Swint's body using Dr. Pak's
> method of wrapping the patient's body with sheets and towel clips,
> without the assistance of Dr. Mae and Nurse Roy. Once Mr. Swint was
> positioned by Drs. Alphonse and Pak, Dr. Mae tilted the operating table
> into the steep Trendelenburg position to the level approved by the
> surgeons. The surgery, conducted by Dr. Alphonse, lasted approximately
> 9 hours and 21 minutes. At no time during the surgery did Defendants
> . . . reposition Mr. Swint's body[, nor did they discuss doing so]. Mr.

---

[2] In this context, a proctor is a surgeon who is trained on one of the specialized instruments being used in the surgery and who is supervising and instructing the physician performing the surgery on the use of that equipment. The record shows that Dr. Alphonse was still training on the robotic equipment in question.

[3] In the lithotomy position, a patient is placed on his or her back with his or her legs up in the air and spread away from the body and with the hips flexed. In a steep Trendelenburg position, the patient's head is positioned below his pelvis at an angle greater than 30 degrees. Thus, a patient in a lithotomy in a steep Trendelenburg position is first placed in the lithotomy position and his or her body is then tilted, head first, "30 degrees or more . . . down against the floor."

3

Swint's body remained in the same position throughout the entire procedure.

After surgery, Defendants took Mr. Swint to a post-surgery recovery room where he complained of pain in both shoulders and arms. Mr. Swint was diagnosed with compartment syndrome[4] in his right arm the following day, and underwent surgery to relieve the pressure [causing the condition]. Following surgery, Mr. Swint did not regain complete use of his right arm and hand.

*Swint I*, 340 Ga. App. at 481 (original footnotes omitted).

In their complaint, the Swints alleged that Dr. Alphonse committed medical malpractice by failing to position Mr. Swint properly at the outset of surgery and then failing to reposition him during the surgery. They further alleged that as a result of this negligence, Mr. Swint suffered injuries in both of his arms and developed compartment syndrome in his right arm, which left him in significant pain and partially disabled.[5] To demonstrate that Dr. Alphonse breached the applicable

---

[4] Compartment syndrome occurs where there has been a buildup or increase in pressure in a particular musculoskeletal area – or compartment – of the body. The increased pressure can eventually stop blood flow to the muscles and if the pressure is not relieved, the condition can result in necrosis of the muscles and lead to the loss of a limb and/or permanent muscle or nerve damage.

[5] The Swints' complaint also alleged that Dr. Mae and Nurse Roy had breached the applicable standard of care in their positioning of Mr. Swint prior to the surgery

standard of care and that this breach was a cause of Mr. Swint's injuries, the Swints offered the expert testimony of Michael A. Palese, M.D. and Paul Collier, M.D. At the time of his 2013 deposition, Dr. Palese, a urologist, was the Director of Minimally Invasive Surgery in the Urology Department of Mount Sinai Medical School. Dr. Palese described his "area of expertise" as "robotic and laparoscopic surgery" and he had previously done a one-year fellowship in robotic and laparoscopic surgery at Cornell New York Hospital. Immediately after completing that fellowship, Dr. Palese established the robotic urological surgery program at Mount Sinai. Additionally, Dr. Palese's affidavit and resume show that he has published in textbooks and medical journals in the area of robotic and laparoscopic urological surgery.

Dr. Palese testified repeatedly that when a patient is placed in the lithotomy in the steep Trendelenburg position (the "LST position") for a lengthy surgery, the standard of care requires the physician to give the patient a positional holiday[6] sometime between the four and five hour mark of the surgery. Dr. Palese's testimony

---

and in failing to insist that Dr. Alphonse reposition him during the surgery.

[6] During a positional holiday, the patient would be taken out of the steep Trendelenburg position, his feet would be removed from the stirrups, and he would be placed in a flat, supine position for some period of time to allow his body to regain equilibrium.

also made clear that his statement of "between four and five hours" was based on the fact that a decision to give a patient a positional holiday at a particular time would depend on how the surgery was progressing. As Dr. Palese explained, complications from an LST position do not generally arise until between the four and five hour mark. If the surgery reached the four-hour mark and the doctor knew the surgery was not going to end soon, then he would need to start preparing for a positional holiday,[7] and then provide such a holiday no later than the fifth hour of surgery. Thus, Dr. Palese opined that the standard of care was breached in this case somewhere between the four and five hour mark, when Dr. Alphonse failed to give Mr. Swint a positional holiday even though he should have known that the surgery was still several hours away from being completed.

Additionally, Dr. Palese's testimony established that giving a patient a positional holiday was the standard of care by the time of Swint's surgery in December 2009. According to Dr. Palese, by 2008, 80% of all prostatectomies in this country were being done robotically, and by 2009 it was "pretty standard" practice for a physician to consider and execute a positional holiday. Dr. Palese explained that

_____

[7] Dr. Palese further testified that as an alternative, a physician could elect to convert from a robotic to a traditional or "open" procedure, where the patient would be moved out of the LST position.

the LST position had been in use for other types of surgeries before robotic prostatectomies became routine, and by 2009 there was "plenty of literature" talking about the need for providing a positional holiday for any patient who was placed in the LST position for a lengthy surgery. Although the only article talking about the need for positional holidays in robotic surgery specifically (as opposed to laparoscopic or other types of surgery) was not published until 2010, Dr. Palese testified that the article itself was written in 2009. Moreover, it was a "review" article, meaning it was based on "quite a bit of literature" that existed prior to 2009.

During his testimony, Dr. Palese acknowledged that if the compartment syndrome had started by the four-hour mark of surgery, and Mr. Swint was thereafter given a positional holiday at five hours, the holiday would not have reversed the compartment syndrome. Dr. Palese further stated, however, that in his opinion, it was "more likely than not" that Mr. Swint would not have suffered such a significant injury had he been given a positional holiday between the four and five hour mark of surgery "rather than waiting until eight or nine hours after the surgery was done." At the end of his deposition, defense counsel asked Dr. Palese whether, if in this case Dr. Alphonse "had gone six hours and then realized that [he was not] getting to the conclusion of the procedure and had [given Swint a positional holiday]" and then

continued on with the procedure for another 2 to 2 ½ hours, "would that have been within the standard of care?" Dr. Palese responded "Yes." He then reiterated that "the start of the compartment syndrome was most likely" between the four and five hour mark, but stated that in his opinion, providing a positional holiday at the six hour mark, even after the start of the compartment syndrome, would have meant "the severity of the injury . . . would probably have been much less" because of the positional holiday.[8]

Following this Court's decision in *Swint I*, Dr. Alphonse moved for summary judgment, arguing that Dr. Palese's testimony failed to establish that any breach of the standard of care caused Mr. Swint's compartment syndrome. In response to that motion, the Swints submitted the affidavit of Paul Collier M.D., a graduate of Yale

---

[8] It appears from the record that after discovering the compartment syndrome on the evening of surgery, Dr. Alphonse referred Mr. Swint to a different department for treatment of that condition. It further appears that the department to which Dr. Alphonse referred Mr. Swint did not respond until the following morning, at which time Mr. Swint underwent surgery. Based on this information, defense counsel asked Dr. Palese, "[a]nd more likely than not had the compartment syndrome been addressed on that evening when Dr. Alphonse made the referral . . . [Mr. Swint's injury] would have been much less severe . . . , true?" . Dr. Palese declined to respond to that question stating he was "not a plastic surgeon, vascular surgeon [,] or orthopedic surgeon, so I can't make an informed opinion about that." In other words, Dr. Palese stated that compartment syndrome was treated by plastic, vascular, or orthopedic surgeons, not by urologists.

Medical School and a general vascular surgeon. Dr. Collier averred that over the course of his 32-year career, he had treated an average of four to six patients a year suffering from compartment syndrome. Additionally, Dr. Collier stated that he was familiar with the LST surgical position and that he had previously performed surgeries that required placing patients in that position. Dr. Collier further testified that he had evaluated Mr. Swint's case "by differential diagnosis and ruled out other explanations for Mr. Swint's compartment syndrome other than the failure to reposition Mr. Swint during a very long surgical procedure."[9] Dr. Collier also stated:

> While it is possible that Mr. Swint developed compartment syndrome prior to the 4-hour mark, it is not probable because the body can typically withstand surgery in a lithotomy with steep Trendelenburg position without complications for that period of time and, had Mr. Swint developed compartment syndrome earlier in the surgical procedure, his condition following surgery would have been far more advanced and, more likely than not, would have required rapid surgical intervention.

---

[9] In his affidavit, Dr. Collier ruled out the following potential causes of the compartment syndrome: Mr. Swint's prior shoulder surgery; Mr. Swint's size and musculature; re-profusion syndrome resulting from an arterial blockage; IV infiltration; pressure from the blood pressure cuff; and "prolonged contact under pressure with a hard object." Dr. Collier also stated his reasons for ruling out these other potential causes of compartment syndrome.

9

Thus, Dr. Collier opined "to a reasonable degree of medical probability that the failure to reposition Mr. Swint during the prolonged surgical procedure caused Mr. Swint to development compartment syndrome" and that "Mr. Swint would not have developed compartment syndrome if he had been taken out of the lithotomy with steep Trendelenburg position no later than the 6-hour mark of surgery."

Based on the foregoing evidence, the trial court granted Dr. Alphonse's summary judgment motion, finding that the applicable standard of care required that Swint be repositioned by the six-hour mark of surgery. Thus, because Dr. Alphonse never repositioned Swint in a surgery that lasted over nine hours, the trial court found that Dr. Alphonse had breached the standard of care. The trial court went on to find, however, that the testimony of Drs. Palese and Collier failed to create a question of fact as to whether Dr. Alphonse's negligence caused Swint's injuries. In support of this conclusion, the trial court relied on Dr. Palese's testimony that there was a high probability that Mr. Swint developed compartment syndrome between four and five hours into surgery. Additionally, the court rejected the expert testimony that even if the compartment syndrome had already begun, giving Mr. Swint a positional holiday at the six-hour mark would have lessened the severity of his injuries, finding that it was not based on "sufficient facts or data." The Swints now appeal from that order.

10

1. To prevail on their claim for medical malpractice, the Swints must establish by a preponderance of the evidence both that Dr. Alphonse breached the applicable standard of care and that this breach proximately caused Mr. Swint's injuries. See *Zwiren v. Thompson*, 276 Ga. 498, 499 (578 SE2d 862) (2003). In their first enumeration of error, the Swints assert that the trial court erred in finding that the undisputed evidence showed that the standard of care required Dr. Alphonse to reposition Mr. Swint "by the six-hour mark" of surgery.

Construed most favorably to the Swints, Dr. Palese's testimony establishes that the standard of care required Dr. Alphonse to reposition Swint sometime between the fourth and fifth hour of surgery. Specifically, that testimony makes clear that when Dr. Alphonse reached the four-hour mark of surgery and realized that he would not finish within the next hour, the standard of care required that he begin preparing Mr. Swint for a positional holiday. Dr. Palese's testimony can also be construed as saying that Dr. Alphonse thereafter was required to provide Mr. Swint with a positional holiday no later than the five-hour mark. To the extent that this testimony may be contradicted either by the testimony of Dr. Palese, Dr. Collier, or the anesthesiology

11

expert (Dr. Rosenfeld)[10], that conflict is for the jury to resolve. As the Supreme Court of Georgia has explained:

> Because a party to litigation is without power to prevent his or her witnesses from contradicting themselves when testifying, the party should not be held responsible . . . when such contradictions inevitably arise in the testimony of expert witnesses. Furthermore, simply because an expert witness's testimony is contradicted is no cause for disregarding it . . . [and] the fact that an expert witness's testimony is contradictory has never rendered that testimony inadmissible. To the contrary, such contradictions go solely to the expert's credibility, and are to be assessed by the jury in weighing the expert's testimony.

*Thompson v. Ezor*, 272 Ga. 849, 853 (536 SE2d 749) (2000). See also *Aleman v. Sugarloaf Dialysis, LLC*, 312 Ga. App. 658, 662 (2) (719 SE2d 551) (2011) (explaining that under *Ezor*, the "self-contradictory testimony rule is not applicable to an expert witness and that the jury must resolve such issues") (punctuation omitted); *Hosp. Auth. of Valdosta/Lowndes County v. Fender*, 342 Ga. App. 13, 20

---

[10] In their brief, the appellees appear to assert that the Swints' failure to include Dr. Rosenfeld's deposition as part of the current appellate record means we have to assume that his testimony supports the trial court's ruling. We disagree. *Swint I* shows that Dr. Rosenfeld's testimony was offered to establish the standard of care required of Dr. Mae and Nurse Roy. Moreover, as explained above, to the extent that a conflict exists between the testimony of Drs. Palese and Rosenfeld as it relates to the standard of care required of Dr. Alphonse, that conflict is for the jury to resolve.

(1) (b) (802 SE2d 346) (2017). Accordingly, we find that the trial court erred in concluding that the standard of care required only that Dr. Alphonse give Mr. Swint a positional holiday no later than the sixth hour of surgery.

2. The Swints further assert that the trial court erred in finding that they had produced insufficient evidence of causation. To establish proximate cause by a preponderance of the evidence in a medical malpractice action, a plaintiff must present expert testimony. *Zwiren*, 276 Ga. at 500.

> Using the specialized knowledge and training of his field, the expert's role is to present to the jury a realistic assessment of the likelihood that the defendant's alleged negligence caused the plaintiff's injury. In presenting an opinion on causation, the expert is required to express some basis for both the confidence with which the his conclusion is formed, and the probability that his conclusion is accurate.

Id. at 500-501 (citation and punctuation omitted).

Thus, "[i]nstead of speaking in terms of possibilities, the expert's testimony must show as an evidentiary threshold that the expert's opinion regarding causation is based, at the least, on the determination that there was a reasonable probability that the negligence caused the injury." Id. at 501 (citations and punctuation omitted). An expert may satisfy this requirement in one of several ways, including testimony "that

13

the only apparent cause of the plaintiff's injury was the defendant's action." Id. This requirement is also satisfied where an expert testifies as to his opinion, based upon the expert's extensive experience in the field, "that, in the absence of the alleged negligence, the patient's condition could have been prevented from worsening." Id. at 501-502 (citation and punctuation omitted). Moreover, "there is no requirement in Georgia law that plaintiffs use a 'proximate causation expert,' and it is well-established that causation may be established by linking the testimony of several different experts." *Fields v. Taylor*, 340 Ga. App. 706, 709 (1) (797 SE2d 127) (2017) (citation and punctuation omitted). It is likewise "well-established that questions regarding causation are peculiarly questions for the jury except in clear, plain, palpable[,] and undisputed cases." *Central Georgia Women's Health Center, LLC v. Dean*, 342 Ga. App. 127, 134 (1) (b) (800 SE2d 594) (2017) (citation and punctuation omitted). See also *Zwiren*, 276 Ga. at 500 ("[w]hat amounts to proximate cause is undeniably a jury question and is always to be determined on the facts of each case") (citations and punctuation omitted).

The trial court's finding regarding the Swints' insufficient evidence of causation appears to be based on two factors. First, the trial court reiterated its finding that the standard of care only required Dr. Alphonse to give Mr. Swint a positional

14

holiday by the sixth hour of surgery, and then noted Dr. Palese's testimony that there was a high probability that the compartment syndrome developed between the fourth and fifth hours of surgery. Given its factual finding as to the standard of care, the trial court concluded that the Swints had failed to produce evidence sufficient to create a jury question as to whether Dr. Alphonse's breach of the standard of care had proximately caused Mr. Swint's injury. As explained supra in Division 1, however, construed in favor of the Swints, Dr. Palese's testimony establishes that the standard of care required Dr. Alphonse begin preparing for a positional holiday by the fourth hour of surgery and give one no later than the fifth hour. Accordingly, the trial court's logic on this point fails.

Moreover, the trial court's ruling on this question rejected Dr. Collier's testimony that, in his professional opinion, there was a high probability that Mr. Swint did not develop compartment syndrome until after the sixth hour of surgery. The trial court summarily found Dr. Collier's opinion was not based on scientific facts or data. Although OCGA § 24-7-702[11] requires that an expert opinion be based

---

[11] That statute provides, in relevant part,

(b) If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill,

15

on "sufficient facts and data," our cases make clear that such facts and data may include the medical records relevant to the current case, the expert physician's own training and experience, and the use of differential diagnosis. See *Fields*, 340 Ga. App. at 710 (2) (a); *Yang v. Smith*, 316 Ga. App. 458, 463-464 (1) (728 SE2d 794) (2012) (physical precedent only). Our precedent also makes clear that an expert need not have clinical studies to support his opinion, and an opinion will be admissible even if the expert admits there are some unknowns with respect to the plaintiff's injury. See *EHCA Dunwoody v. Daniel*, 277 Ga. App. 783, 786 (1) (627 SE2d 830) (2006).

---

experience, training, or education may testify thereto in the form of an opinion or otherwise, if:

(1) The testimony is based upon sufficient facts or data;

(2) The testimony is the product of reliable principles and methods; and

(3) The witness has applied the principles and methods reliably to the facts of the case which have been or will be admitted into evidence before the trier of fact.

OCGA § 24-7-702 (b).

16

In *Daniel*, the plaintiff sued when, after the hospital used a latex catheter on her, she developed interstitial cystitis ("IC"). The plaintiff claimed that her IC resulted from her known allergy to latex, and she provided expert testimony to support that claim. Her expert acknowledged at trial "that the causes of IC are unknown and that no research has linked IC to latex allergies." 277 Ga. App. at 786 (1). He noted, however, that "IC usually occurs after some trauma – such as an allergic reaction – in the bladder" and given all the factors surrounding the plaintiff's condition "including that she did not suffer from IC prior to insertion of the latex catheter, [he had] concluded that, to a reasonable degree of medical certainty, the latex exposure caused the condition." Citing this testimony, the hospital appealed the trial court's denial of its motion for judgment n.o.v., arguing that the plaintiff had failed to prove the causation element of her claim, as the expert's testimony was purely speculative. We rejected that argument, finding that the expert's testimony, which was based on his knowledge of IC, his experience treating the disease, and the facts of the case, could not "be dismissed as speculation." Id.

Neither the trial court's order nor the appellees' brief cites "any relevant authority that establishes how [Dr. Collier] failed to rely on sufficient facts or data . . . . Instead, [both the order and the appellees' brief] list[] what [they] assert[] to be

17

deficiencies in the bases for the opinions of both [experts]." *Fields*, 340 Ga. App. at 712 (2) (b). Construing the evidence and all reasonable inferences therefrom most favorably to the Swints, however, the record shows that Dr. Collier's opinion was based on his review of Mr. Swint's medical records, his familiarity with operating on patients in the LST position and the risks associated therewith, his familiarity with compartment syndrome and its causes and treatments, and his 32 years of experience as a vascular surgeon. Under relevant law, therefore, Dr. Collier's opinion was based on sufficient facts and data. Moreover, any alleged deficiencies in the bases for his opinion would go to both the credibility of Dr. Collier's testimony and any weight a jury might wish to assign to it. Id.

Additionally, the trial court found that Dr. Palese's testimony, that providing Mr. Swint with a positional holiday no later than the six-hour mark of surgery would have decreased the severity of his injury, was also insufficient to prove causation. This conclusion was again based on the trial court's finding that Dr. Palese's opinion lacked sufficient supporting facts and data.[12] Our precedent makes clear, however,

_____

[12] In reaching this conclusion, the trial court pointed to the fact that Dr. Palese declined to opine as to whether, following the development of the compartment syndrome during the approximately 9 1/2 hour surgery at issue, Mr. Swint's failure to be seen by the vascular or plastic surgery departments until the following day decreased Mr. Swint's chances of regaining the full use of his arm. The trial court

18

that an expert's opinion testimony that a physician's breach of the standard of care caused a patient's condition to become worse is sufficient to present a question of causation for the jury, where that opinion is based on the expert's review of medical records and his training and experience. See *Knight v. Roberts*, 316 Ga. App. 599, 605-606 (1) (a) (730 SE2d 78) (2012) (opinion testimony of three different physicians that an ER physician's misdiagnosis contributed to the patient's death 10 days after being treated at the ER and after the patient had been treated by three additional physicians at two additional hospitals, was sufficient to create a question of fact on the issue of causation; the physicians' opinions were based on the review of medical files and their significant experience either as ER physicians or as specialists in treating the plaintiff's undiagnosed condition); *MCG Health, Inc. v. Barton*, 285 Ga. App. 577 (647 SE2d 81) (2007).

In *Barton*, the plaintiff sued when, following an injury to his testicles, emergency room personnel failed to treat him in a timely fashion, which he alleged resulted in the loss of a testicle. To support his claim, the plaintiff submitted expert

characterized this testimony as Palese "declin[ing] to testify as to the temporalis specifics of compartment syndrome." We disagree with this characterization of Dr. Palese's testimony, as it is clear that Dr. Palese was simply saying that urologists do not treat compartment syndrome.

19

opinion testimony that "the chances for successfully salvaging the testicle decrease[d] the longer treatment of the [injury was] delayed, and that if [the the type of injury sustained by plaintiff] [was] not treated within 12 hours from the time the patient first began experiencing pain, the chances of salvaging the testicle [became] more remote." 285 Ga. App. at 582 (2). The hospital moved for summary judgment, arguing that the plaintiff could not prove causation because his "medical expert could only speculate that [plaintiff's] testicle would have been salvageable if [hospital] staff had not delayed his evaluation and the . . . urologists had not delayed treatment." Id. at 583 (3). The trial court denied that motion and this Court affirmed, noting the testimony showing that ER personnel had failed to triage the patient properly, in violation of the standard of care, and that in the absence of this violation, the plaintiff would have been treated sooner. Based on this fact, the plaintiff's "medical expert concluded that these deviations delayed [plaintiff] being seen by a physician, and that this delay led to the loss of his testicle. *The fact that [plaintiff's] medical expert could not testify as to the exact point in time at which [the] testicle became unsalvageable does not render his testimony mere speculation*." Id. at 583-584 (3) (emphasis supplied).

Here, construed in favor of the Swints, the evidence showed that Dr. Palese was an expert in the field of robotic urological surgery; that he had performed numerous robotic prostatectomies and had trained others on how to perform them; that he was familiar with the risks of compartment syndrome associated with the LST position; and that based on his training and experience and his review of Mr. Swint's medical records, he believed it was more likely than not that giving Mr. Swint positional holiday after compartment syndrome had begun would have lessened Mr. Swint's injury in this case. Accordingly, we cannot say that the evidence regarding causation was so "clear, plain, palpable [,] and undisputed" as to demand the entry of summary judgment in favor of Dr. Alphonse. See *Fender* 342 Ga. App. at 20 (1) (b); *Knight*, 316 Ga. App. at 605-606 (1) (a); *Barton*, 285 Ga. App. at 584 (3).

For the reasons set forth above, we reverse the order of the trial court granting summary judgment in favor of Dr. Alphonse and Midtown Urology and against Fritz and Melissa Swint.

*Judgment reversed. Ellington, P. J., and Brown, J., concur*.