A03A0780. KNIGHT et al. v. WEST PACES FERRY HOSPITAL, INC.
(585 SE2d 104)

JOHNSON, Presiding Judge.

After undergoing cervical disc surgery at West Paces Ferry Hospital, Laura Knight contracted a staph infection, and eventually contracted a permanent, debilitating illness known as pyoderma gangrenosum. Knight and her husband filed a medical malpractice action against West Paces Ferry Hospital, Inc., alleging the hospital nursing staff's negligence caused her to contract the staph infection, and that the staph infection triggered the pyoderma gangrenosum.

West Paces Ferry Hospital denied that its agents acted negligently, and moved for summary judgment. The trial court denied the motion, and the case proceeded to a jury trial. After six days of trial, during the presentation of the hospital's case, the hospital moved for a directed verdict, urging that Knight failed to prove that the staph infection was caused by the negligence of the hospital staff. The trial court granted the hospital's motion for a directed verdict, stating that Knight failed to prove that the nursing staff's failure to wash their hands caused the staph infection. The Knights appeal from the directed verdict. We reverse.

A directed verdict is proper only if there is no conflict in the evidence as to any material issue and the evidence introduced, with all reasonable deductions therefrom, shall demand a verdict.[1] In deter-

---

[26] See *Powley v. Precision Plumbing Co.*, 222 Ga. App. 848, 850-851 (4) (476 SE2d 777) (1996) (physical precedent only).

[1] OCGA § 9-11-50 (a).

mining whether a conflict in the evidence exists, the court must construe the evidence most favorably to the party opposing the motion for a directed verdict.[2]

To prove a medical malpractice claim in Georgia, a plaintiff must show: (1) the duty inherent in the health care provider-patient relationship; (2) breach of that duty by failing to exercise the requisite degree of skill and care; and (3) that this failure is the proximate cause of the injury sustained.[3]

In this case, Knight sued the hospital alleging that the hospital's nursing staff breached the applicable standard of care in the manner in which they administered IV therapy, that the breach caused her to contract a staph infection, and that the staph infection triggered the disease from which she now suffers, pyoderma gangrenosum. The only negligence issue raised on appeal is whether the Knights presented evidence that the nursing staff's failure to abide by the applicable standard of care caused the staph infection. The following evidence was presented at trial.

Knight testified that she was admitted to the hospital for disc surgery on August 5, 1997. During Knight's recovery at the hospital, she and her husband noticed that the staff never wore rubber gloves while inserting intravenous tubes into her arms and never washed their hands before attempting to insert the needles. They observed that on at least nine occasions, when the IV needle came out of Knight's vein, nurses, who were not wearing gloves, restuck her multiple times with the same needle. The Knights noticed that on one occasion, Knight's tubing became disconnected and fell onto her bedding, then was picked up by a nurse, who was not wearing gloves, and reconnected to the IV tubing without the needle being changed. Knight's husband questioned one nurse regarding the nursing staff's handwashing practices, but he was ignored.

On August 8, 1997, the day Knight was released, she had tenderness and soreness on her right arm at the sites of the multiple failed IV insertion attempts. She also had a temperature of 100°F at the time of her release, indicating the presence of an infection. Three weeks later, a small cut on her leg turned into a gaping wound which ulcerated and deepened. She continued to develop skin lesions on her body, including at the IV sites. After multiple hospital stays and doctors' visits, she was diagnosed with pyoderma gangrenosum, a permanent condition which is characterized by continuous infections from open skin wounds.

Julie Webster, a nurse practitioner and expert in nursing care,

---

[2] *Driggers v. Campbell*, 247 Ga. App. 300, 302-303 (2) (543 SE2d 787) (2000).
[3] *Zwiren v. Thompson*, 276 Ga. 498 (578 SE2d 862) (2003).

testified that the nursing staff violated the standard of care for nursing professionals by failing to wash their hands, failing to wear gloves, and reconnecting with their bare hands IV tubing which fell onto the bed.

Dr. Alben Goldstein, a physician who is board-certified in internal medicine and rheumatology, testified that Knight suffers from pyoderma gangrenosum. At trial, he was asked to provide his opinion by assuming various facts already in the record. He was asked to assume that a patient at the hospital was subjected to multiple IV needle sticks and infiltrations, that the nursing staff failed to wash their hands or wear gloves before they performed IV therapy, and that she was discharged with a swollen arm, redness at her IV sites, and a fever of 100°F. He was asked to further assume that approximately one month after her discharge, she began to develop lesions at the IV sites and elsewhere on her body. Dr. Goldstein was asked whether, in his opinion, Knight contracted a staph infection at the hospital. He replied that "there is a reasonable degree of medical certainty that Mrs. Knight contracted a staph infection in the hospital."

Dr. Goldstein was then asked:

Q: So, just so we are clear on this, doctor, it's your opinion that Mrs. Knight contracted a staph infection at West Paces Ferry Hospital during her stay from August 5 through August 8, 1997, which triggered the pyoderma gangrenosum that she now suffers?
A: That's correct.
Q: And is your opinion to a reasonable degree of medical certainty?
A: Yes.

One of Knight's treating physicians, Dr. Tiffani Hamilton, testified that staph infection is a known triggering mechanism of pyoderma gangrenosum and that the time period described by Knight as to the onset of her condition is consistent with having been triggered by a staph infection contracted during her hospitalization.

Another of Knight's treating physicians, Dr. Patricia Dubose, testified that staph infections can occur when nonaseptic techniques are used in IV therapy or when nurses do not use gloves or wash their hands during IV therapy. Dr. Dubose added that staph infections can be transmitted from a nurse's hand if an IV tube becomes disconnected, falls onto a patient's bed, and is reconnected. The doctor noted that the infection rate is normally low if there is a "clear easy stick" and nurses use aseptic technique, i.e., clean the site with Betadine and alcohol while wearing gloves. She added that the more times the patient is stuck, the more opportunity there is for a staph

infection to occur and that, generally, a patient should not get a staph infection if the proper sterile techniques are followed.

Dr. Dubose was asked to assume that a patient was hospitalized for four days, stuck with an IV needle 10-14 times per day for three days, by nurses who wore no gloves and failed to wash their hands, that the IV tubing became disconnected and fell onto the bed and then was reconnected by a nurse without gloves, that the patient was discharged with pain, redness in the arm at the IV sites, and a temperature of 100°F, and that a short time later her arms were swollen. Based on those facts, Dr. Dubose was asked if she had an opinion regarding whether the patient had contracted a staph infection while at the hospital. Dr. Dubose replied, "it certainly sounds like the story of IV site infection." Dr. Dubose added that her opinions were to a reasonable degree of medical certainty.

Before the trial court can direct a verdict for the movant, he must find from the evidence that there is *no evidence of any kind* supporting the nonmovant's position.[4] That is not the case here. The evidence included testimony that the nurses violated the standard of care in the nonaseptic manner in which they handled Knight's IV therapy; that staph infections can result from failure to use aseptic, sterile procedures; that, in Dr. Dubose's opinion, the symptoms and conditions exhibited by Knight after being subjected to those substandard nursing procedures "certainly sound[ed] like . . . IV site infection"; that Dr. Dubose based her opinion on a reasonable degree of medical certainty; that the infection rate is low when aseptic techniques are used; and that Dr. Goldstein opined that, assuming Knight was subjected to the nonaseptic procedures described and then developed the conditions of which she complained, there was a reasonable degree of medical certainty that she contracted a staph infection in the hospital and that the infection triggered the pyoderma gangrenosum. Because the record contains some evidence to support the Knights' negligence claim against the hospital, we conclude that the trial court erred in granting a directed verdict in the hospital's favor.[5]

*Judgment reversed. Eldridge and Mikell, JJ., concur.*

DECIDED JUNE 17, 2003 —
RECONSIDERATION DENIED JULY 9, 2003 — 

*Decker, Hallman, Barber & Briggs, Richard P. Decker, William W. Briggs, Stacy E. Hyken,* for appellants.

---

[4] *Willis Mining v. Noggle,* 235 Ga. App. 747, 751 (4) (509 SE2d 731) (1998).

[5] See generally *Walter Champion Co. v. Dodson,* 252 Ga. App. 62, 65 (2) (a) (555 SE2d 519) (2001); compare *Goggin v. Goldman,* 209 Ga. App. 251, 252-253 (433 SE2d 85) (1993).

*Weinberg, Wheeler, Hudgins, Gunn & Dial, Earl W. Gunn, Ashley P. Nichols*, for appellee.