## A07A1614. HAWKINS v. OB-GYN ASSOCIATES, P.A. et al.

(660 SE2d 835)

MILLER, Judge.

This is an appeal from a directed verdict granted in favor of Goodman B. Espy III, M.D. and his professional association, OB-GYN Associates, P.A. (collectively, the "Association"), in a case alleging mismanagement of an obstetrical complication known as shoulder dystocia. Trenton Hawkins, a minor child, by and through his mother and natural guardian, Devi Hawkins, as next friend, appeals, contending that the trial court (i) erred in granting a directed verdict for the Association, (ii) erred in sustaining the Association's objections to portions of the evidentiary deposition of treating neurosurgeon Dr. Rahul Nath, and (iii) erred in denying his motion in limine as to expert witness Dr. James O'Leary. Finding that the directed verdict for the Association was proper, we affirm.

"[W]hether a witness is qualified to render an opinion as an expert is a legal determination for the trial court and will not be disturbed absent a manifest abuse of discretion." (Citation, punctuation and footnote omitted.) *Moran v. Kia Motors America*, 276 Ga. App. 96, 97 (1) (622 SE2d 439) (2005). Further,

> a directed verdict is appropriate only if there is no conflict in the evidence as to any material issue and the evidence introduced, construed most favorably to the party opposing the motion, demands a particular verdict. OCGA § 9-11-50 (a); *Norfolk Southern Corp. v. Smith*, 262 Ga. 80, 8[3] (2) (414 SE2d 485) (1992).

*St. Paul Mercury Ins. Co. v. Meeks*, 270 Ga. 136, 137 (1) (508 SE2d 646) (1998).

So viewed, the evidence shows that Dr. Espy initially used a vacuum extractor and forceps to aid in Trenton's delivery in 1998. Dr. Espy testified that after delivering Trenton's head, he cradled it in his hands, applied gentle traction, and upon feeling resistance, stopped any further pulling and diagnosed shoulder dystocia.[1] Because such condition represented a potential threat to the flow of oxygen to Trenton's brain due to possible compression of his umbilical cord, Dr. Espy relieved the condition within 30 to 40 seconds by employing the McRoberts maneuver (pulling Hawkins' legs up and back toward her abdomen to open up and rotate her pelvic bone) and suprapubic pressure (external pressure above her pelvic bone).

---

[1] According to the record, shoulder dystocia is an unpredictable and unpreventable condition that occurs when the shoulder of the infant becomes lodged behind the mother's pubic bone, preventing the delivery of the infant's shoulders and body.

Following his birth, Trenton was diagnosed as having suffered damage to the network of nerves in his right shoulder, collectively known as the brachial plexus. Drs. Saleh H. Chinook and Rahul Nath, neurosurgeons specializing in the treatment of nerve and brachial plexus injuries, operated on the injury to Trenton's shoulder in 2002 and 2003, respectively. These operations improved Trenton's condition; however, Dr. Nath opined that a 2006 videotape taken of Trenton indicated that further corrective surgery was required to relieve continued tightening in his right elbow and to improve the function of his right hand. At trial, Hawkins' expert witness, Dr. Stuart Edelberg, opined that Trenton's brachial plexus injury was caused by the negligent application of excessive downward lateral traction to Trenton's head at the time Dr. Espy diagnosed shoulder dystocia or as he managed it thereafter.

1. Hawkins contends that the trial court erred in granting a directed verdict to the Association for lack of causation evidence, citing the testimony of his expert witness, Dr. Edelberg. We disagree.

The trial court, over objection, allowed Dr. Edelberg's opinion as to causation. That opinion was based upon a "differential diagnosis," which is "a patient-specific process of elimination that medical practitioners use to identify the most likely cause of [an injury] from a list of possible causes." (Citations and punctuation omitted.) *Ruggiero v. Warner-Lambert Co.*, 424 F3d 249, 254 (II) (2d Cir. 2005).

OCGA § 24-9-67.1 (f) authorizes Georgia courts, in all civil cases, to consider federal authority when determining the admissibility of expert evidence thereunder. *Mason v. Home Depot U.S.A.*, 283 Ga. 271 (658 SE2d 603) (2008).

> A differential diagnosis satisfies a *Daubert* [*v. Merrell Dow Pharmaceuticals*, 509 U. S. 579 (113 SC 2786, 125 LE2d 469) (1993)] analysis if the expert uses reliable methods . . . based on scientifically valid decisions as to which potential causes should be "ruled in" or "ruled out." Determining the reliability of an expert's differential diagnosis is a case-by-case determination.

(Citation omitted.) *Ervin v. Johnson & Johnson*, 492 F3d 901, 904 (II) (7th Cir. 2007). "Where an expert employs differential diagnosis to 'rule out other potential causes' for the injury at issue, he must also rule in the suspected cause, and do so using 'scientifically valid methodology.' " (Citation and punctuation omitted.) *Ruggiero*, supra, 424 F3d at 254 (II).

In rendering his opinion as to the cause of Trenton's injury, Dr. Edelberg ruled out a congenital absence of the brachial plexus nerve,

an infection of such nerve, a prolapsed arm during delivery, malpositioning during delivery, and failed maneuvers used to relieve shoulder dystocia as causing Trenton's injury. He did not, however, "rule in" excessive traction to Trenton's head at the time of diagnosis by a "scientifically valid methodology" (*Ruggiero*, supra, 424 F3d at 254), instead offering only his bare assumption to such effect as "more probably than not" the cause of the injury to the child.

The said assumed cause of injury was not only unsupported by any evidence, but was contrary to all the evidence of record. That evidence included the testimony of both Dr. Espy and the other witnesses in the delivery room that Dr. Espy had used only gentle traction to diagnose the shoulder dystocia and then delivered the baby without using any traction at all. Moreover, while Dr. Edelberg testified as to his summary conclusion that the shoulder dystocia at issue resulted from excessive traction, he acknowledged that his theories of causation as to shoulder dystocia have never been submitted to peer review and are contrary to those taught by the textbooks, residency programs, and the American College of Obstetricians and Gynecologists.

On the record before this Court, Dr. Edelberg, in effect, infers negligence upon an unintended result. "Georgia courts[, however,] have expressly ruled that the doctrine of res ipsa loquitur does not apply in a malpractice case. An unintended result does not raise an inference of negligence. It is presumed that medical or surgical services were performed in an ordinarily skillful manner." (Citations and punctuation omitted.) *Oakes v. Magat*, 263 Ga. App. 165, 168 (2) (587 SE2d 150) (2003); *Austin v. Kaufman*, 203 Ga. App. 704, 705 (1) (417 SE2d 660) (1992).

Moreover, even if the doctrine were applicable here, it does not apply when all possible causes other than the defendant's negligence cannot be excluded. "Where there is any intervention of an intermediary cause which produces or could produce the injury complained of, the doctrine of res ipsa loquitur is . . . [in]applicable." (Citations and punctuation omitted.) *Parker v. Dailey*, 226 Ga. 643, 645 (1) (177 SE2d 44) (1970). As we have noted earlier, Dr. Edelberg acknowledged that excessive traction was only "more probably than not" the cause of the injury and that it could have been the result of other causes, among them, an accident or an act of God.

Beyond his failure to reliably "rule in" excessive traction as the cause of the injury at issue (*Parker*, supra, 226 Ga. at 645), as above, Dr. Edelberg's testimony also failed to establish that Dr. Espy acted negligently in delivering Trenton. He could point to no evidence of record showing that the standard of care was violated. Dr. Edelberg testified that he inferred negligence in this case merely because an injury to the brachial plexus occurred and shoulder dystocia was

encountered during the delivery. This opinion, inferred upon circumstantial evidence, is contrary to all the direct evidence of record to the effect that no excessive traction was applied, i.e., that Dr. Espy did not breach the applicable standard of care. "[S]uch circumstantial evidence would not defeat positive, direct testimony to the contrary. . . . Drawing an inference premised on a nonexistent fact, [that excessive traction was used], cannot surmount positive direct testimony" that the same was not used. *Birnbrey, Minsk & Minsk, LLC v. Yirga*, 244 Ga. App. 726, 729 (1) (535 SE2d 792) (2000); see also *Kines v. City of Rome*, 220 Ga. App. 732, 733 (470 SE2d 311) (1996) ("[The t]estimony of an expert witness should not be admitted in evidence where his opinion is based on facts stated in a hypothetical question which are not proven by other witnesses or other competent evidence.") (citation and punctuation omitted).

Given the foregoing, we conclude that the trial court did not err in granting the Association a directed verdict for no evidence of causation on this account. *Moran*, supra, 276 Ga. App. at 97 (1).

2. Hawkins contends that the trial court erred in excluding Dr. Nath's causation testimony by videotaped deposition at trial, arguing (i) that the Association's objections thereto could have been resolved prior to trial pursuant to a *Daubert* motion, and (ii) that his opinion indicating that Trenton's injuries were the result of excessive traction employed at the time of Trenton's birth was competent evidence. Again we disagree.

(a) The Association's objections to Dr. Nath's testimony at the time of his videotaped deposition were properly reserved until trial and timely ruled upon at trial outside the presence of the jury. Consequently, there was no error on this account. See *Mayor &c. of Savannah v. Palmerio*, 135 Ga. App. 147, 153 (217 SE2d 430) (1975) (approving the use of videotaped evidentiary testimony at trial). Even were it otherwise, Hawkins interposed no objection to the timeliness of the Association's objections to Dr. Nath's testimony at trial. Thus, such objections are waived on appeal. *Hodge v. Lott*, 251 Ga. App. 288, 290 (1) (553 SE2d 652) (2001).

(b) The trial court properly excluded Dr. Nath's opinion testimony as to the cause of Trenton's injury.

While it is true that an expert may give his opinion without stating the facts upon which it is based, yet when the basis of his opinion is given and it appears *wholly speculative or conjectural*, it must follow that his opinion is without foundation and has no probative value. Speculation and conjecture by an expert is still speculation and conjecture, and will not support a verdict.

(Emphasis supplied.) *Bankers Health & Life Ins. Co. v. Fryhofer*, 114 Ga. App. 107, 111 (1) (150 SE2d 365) (1966).

Here, Dr. Nath deposed on cross-examination that he "assumed" that the injury to Trenton's shoulder might be "traction-related" because he knew that nerve reconstruction literature had associated brachial plexus injury with shoulder dystocia in vacuum-assisted deliveries in which forceps were used. However, there is no indication of record that Dr. Nath reviewed the medical records related to Trenton's delivery. Moreover, the record shows that Dr. Nath does not deliver babies or practice obstetrics; that he has never performed a vacuum-assisted or forceps delivery; that he has never managed a shoulder dystocia or performed any of the maneuvers to relieve it; that he is not involved in any research into the causes of brachial plexus injuries; that he was not present for Trenton's delivery; that he saw Trenton for the first time in 2002, four years after his delivery; and that he "assumed" that the brachial plexus injury to Trenton's shoulder resulted from the nature of his delivery based upon his knowledge that such injury had been "associated" with shoulder dystocia in vacuum-assisted and forceps deliveries.

Dr. Nath's opinion as to the cause of Trenton's shoulder injury thus, in the last analysis, rests upon mere assumption. Dr. Nath's opinion testimony, therefore, must be deemed wholly speculative and conjectural. *Bankers Health*, supra, 114 Ga. App. at 111 (1); *Hobday v. Galardi*, 266 Ga. App. 780, 783 (598 SE2d 350) (2004). Accordingly, the trial court did not abuse its discretion in refusing to allow such evidence. *Moran*, supra, 276 Ga. App. at 97 (1).

3. Finally, Hawkins challenges the denial of his motion in limine as to his identified expert witness Dr. O'Leary. The motion sought to exclude impeachment or bias evidence that "Dr. O'Leary had at one time experienced difficulties with alcohol, and was treated for those difficulties[ ]" that "Dr. O'Leary was sued by a previous employer, denied liability, was sued, and, after losing that civil suit, paid the judgment."

Regarding the history of Dr. O'Leary's alcoholism, the trial court expressly reserved its ruling on the issue. Because Hawkins never called Dr. O'Leary as a witness and never renewed his objection, there is no trial court ruling for this Court to review, and that issue was abandoned. "A party cannot abandon an issue in the trial court and on appeal raise issues neither raised nor ruled upon by the trial court." (Footnote omitted.) *Hadlock v. Anderson*, 246 Ga. App. 291, 295 (2) (540 SE2d 282) (2000). Hawkins acknowledges the same in his appellate brief.

Moreover, Hawkins chose not to call Dr. O'Leary as a witness to testify in response to the complained of ruling, instead telling the trial judge that the parties had "agreed to shorten the trial a bit."

Where a party elects not to call a witness to testify in response to a ruling by the trial court, "there is no . . . abuse of discretion as will justify the grant of a new trial when the record does not contain a proffer as to what the expert could or would have testified to as a witness." (Citation omitted.) *Pittman v. State*, 274 Ga. 260, 263 (553 SE2d 616) (2001).

"Before the trial court can direct a verdict for the movant, he [or she] must find from the evidence that there is *no evidence of any kind* supporting the nonmovant's position." (Footnote omitted; emphasis in original.) *Knight v. West Paces Ferry Hosp.*, 262 Ga. App. 220, 223 (585 SE2d 104) (2003). This is such a case. Because the record contains no evidence to support Hawkins' negligence claim against the Association, we conclude that the trial court did not abuse its discretion and properly granted a directed verdict in the Association's favor. *St. Paul*, supra, 270 Ga. at 137 (1); *Moran*, supra, 276 Ga. App. at 97 (1).

*Judgment affirmed. Barnes, C. J., concurs and Smith, P. J., concurs specially.*

SMITH, Presiding Judge, concurring specially.

I fully concur in the majority opinion and all that is said there. I agree that the testimony of the expert witness, Dr. Edelberg, was insufficient to survive a directed verdict because he improperly based his opinion upon an assumption that was contradicted by all the evidence presented at trial, because it countered direct evidence with merely circumstantial evidence, and because it was improperly based upon a "differential diagnosis" that did not eliminate all other causes of the injury. I concur specially to note that his testimony is also insufficient to survive a directed verdict because Dr. Edelberg's lack of credentials and his failure to review or consider the evidence in the case before us are so profound that no weight should be given to his testimony.

The trier of fact may "consider the expert's credentials and then give such weight and credit to the expert's testimony as it sees fit." *McCoy v. State*, 237 Ga. 118, 119 (227 SE2d 18) (1976); see also *Adams v. State*, 275 Ga. 867, 868 (3), n. 8 (572 SE2d 545) (2002). At the time of trial, this witness's only teaching position was at an unaccredited offshore medical school; he was not paid and had never taught a class there, only visiting the school once. He was on staff at a hospital in Maryland, where he was hired to revive a failing OB-GYN residency but failed in that attempt. He testified at trial that he was leaving that position and was not credentialed in the state to which he planned to move. He withdrew from the board recertification process due to the risk of losing his existing certification if he failed, and he

twice failed board certification in maternal fetal medicine. In addition, he has never published on the topic of shoulder dystocia in a peer reviewed journal. He has very little recent obstetrics experience, and he has refused to submit his conclusions to expert witness peer review.

Moreover, Dr. Edelberg acknowledged that he merely "scampered" through the medical case records before giving his opinion in his deposition. He changed his opinion at trial on the crucial issue of when he believed the defendant's alleged negligence occurred. His theories of causation and management of cases with shoulder dystocia, as the trial court noted and the expert himself acknowledged, are directly contrary to those taught by the textbooks, residency programs, and the American College of Obstetricians and Gynecologists, and his theories have never been subjected to peer review.

Finally, Dr. Edelberg agreed that he does not "care what the medical records say" or "what the doctor said in his or her deposition" with regard to what actually occurred during delivery. He also testified that "[i]t does not matter to me" and he "will not accept" the testimony of the other eyewitnesses in the room that the doctor never pulled on the baby's head after shoulder dystocia was diagnosed. His opinion was thus offered based upon few, if any, qualifications and his acknowledged refusal to accept the facts in evidence. Under these circumstances, it was wholly unworthy of belief.

For all these reasons, I specially concur.

DECIDED MARCH 28, 2008 —
RECONSIDERATION DENIED APRIL 10, 2008 — 

*Joseph H. King, Jr.*, for appellant.
*Alston & Bird, Judson Graves, Victoria D. Lockard*, for appellees.
*Peters & Monyak, Robert P. Monyak, Jeffrey S. Bazinet*, amici curiae.