**FIRST DIVISION**
**ELLINGTON, C. J.,**
**PHIPPS, P. J., and DILLARD, J.**

NOTICE: Motions for reconsideration must be *physically received* in our clerk's office within ten days of the date of decision to be deemed timely filed.
(Court of Appeals Rule 4 (b) and Rule 37 (b), February 21, 2008)
http://www.gaappeals.us/rules/

June 12, 2012

# In the Court of Appeals of Georgia

A12A0014; A12A0015. YANG v. SMITH et al.; and vice versa.

ELLINGTON, Chief Judge.

Following a trial in this medical malpractice action, the jury returned a verdict in favor of defendants Stephanie Smith, M.D., and Gwinnett Anesthesia Service, P.A. ("GAS"). In Case No. A12A0014, the plaintiff, Chong Yang, appeals from the final judgment and from the denial of her motion for new trial, contending that the trial court abused its discretion in denying her motions in limine to exclude certain testimony of two expert witnesses for the defense. In Case No. A12A0015, Dr. Smith and GAS cross-appeal, contending that the trial court abused its discretion in denying their motion to exclude certain testimony of one of Yang's expert witnesses, as well as in excluding the testimony of one of their defense witnesses. For the following

reasons, we affirm the judgment in Case No. A12A0014, and dismiss as moot the appeal in Case No. A12A0015.

The standard of review for all four of the enumerated errors is the same. "The issue of the admissibility or exclusion of expert testimony rests in the broad discretion of the trial court, and consequently, the trial court's ruling thereon cannot be reversed absent an abuse of discretion." (Punctuation and footnote omitted.) *Carter v. Smith*, 294 Ga. App. 590, 591 (1) (669 SE2d 425) (2008). Further, "[w]e review a trial court's ruling on a motion in limine for abuse of discretion. A motion in limine is properly granted when there is no circumstance under which the evidence under scrutiny is likely to be admissible at trial." (Punctuation and footnote omitted.) *Hankla v. Jackson*, 305 Ga. App. 391, 392 (1) (699 SE2d 610) (2010).

Viewed in favor of the jury's verdict,[1] the evidence shows that, in 2005, Yang suffered an injury to the area around her left eye. In 2006, after being treated for severe facial pain by several other physicians and alternative practitioners and after trying numerous prescription medications without success, she sought treatment from Dr. Gurudat Setty at GAS. Dr. Setty initially diagnosed Yang with trigeminal neuralgia, and he recommended a trigeminal nerve block injection near a facial nerve

---

[1] *Almond v. McCranie*, 283 Ga. App. 887, 888 (643 SE2d 535) (2007).

as an initial effort to block the pain and to verify the diagnosis. According to Dr. Setty, if the trigeminal nerve block did not relieve Yang's pain, then other diagnostic and treatment modalities would have to be pursued to discover and address other potential causes of the pain, such as atypical facial pain, a tumor, multiple sclerosis, lupus, sarcoidosis, or disk herniation, among others. Dr. Setty's partner, Dr. Smith, performed the trigeminal nerve block injection on June 14, 2006. Dr. Smith recommended that Yang return for a second trigeminal nerve block injection in two weeks.

Although the first trigeminal nerve block reduced Yang's pain, it also caused some swelling and side effects, and, when Yang saw Dr. Smith at the two week follow-up appointment, she refused to have the second nerve block injection. Because Yang was still experiencing some pain, Dr. Smith broadened her working diagnosis to include atypical facial pain, which can be the result of at least 20 different disease processes, including trauma, stroke, cervical spine problems, immunologic disorders, herpes zoster and other infections. According to Dr. Smith, in attempting to diagnose the actual cause of atypical facial pain, it is often necessary to try different types of injections to see whether they are effective in treating the pain. Consistent with that approach, Dr. Smith performed a stellate ganglion injection; she also gave Yang a

3

prescription for pain medication. On September 15, 2006, Yang called Dr. Smith's office and reported that she had had significant improvement in her pain, but was still experiencing some pain and "heaviness" around her left eye and her mouth. Dr. Smith renewed Yang's pain medicine prescriptions and instructed her to return to the clinic in four weeks.

When Yang saw Dr. Smith in mid-October, she reported having on-going facial pain and swelling, as well as moderate depression, anxiety and panic attacks. Dr. Smith performed a cervical epidural steroid injection, during which she inserted the needle between Yang's C5 and C6 vertebrae. According to Dr. Smith and a nurse who observed the procedure, Yang was sedated but semi-conscious, was able to move her hands and feet, and was able to respond to questions throughout the procedure.

Yang went home after the procedure, but, a few hours later, she began experiencing severe pain, could not move her arm and was unable to walk. She was transported to Gwinnett Medical Center by ambulance. An MRI revealed that Yang had a lesion inside her cervical spinal cord that extended from the C2 to the C7 vertebrae. Over a few months, the lesion gradually shrank to a "focal lesion" between the C5 and C6 vertebrae, the area where Dr. Smith had performed the cervical epidural

injection. While Yang's symptoms improved over time, she continued to experience severe pain, to have problems with her left hand, and to have difficulty walking.

Yang filed this medical malpractice suit against Dr. Smith and GAS, contending, inter alia, that Dr. Smith had caused the lesion to develop by improperly injecting medication directly into her spinal cord during the cervical injection and that such act violated the standard of care. Dr. Smith and GAS defended the claim by presenting, in addition to other evidence, the expert witness opinion testimony of Dr. Owen Samuels, who testified that Yang's theory of causation was not supported by the evidence and was very unlikely. Dr. Samuels also offered alternative explanations for the cervical lesion which he deemed much more probable than Yang's theory, including the opinion that a cervical inflammatory lesion was present before Dr. Smith's cervical injection, that it was the result of an unrelated and previously undiagnosed autoimmune disorder, and that it may have been irritated by the cervical injection.

The jury rendered a defense verdict, and Yang filed a motion for new trial, challenging, inter alia, the trial court's decision to admit the testimony of Dr. Samuels and Dr. Setty. The trial court denied the motion, concluding that Dr. Samuels' testimony was admissible because he had applied a scientifically reliable method,

differential diagnosis, to the evidence before concluding that it was unlikely that the cervical injection had caused the lesion and that, instead, it was more likely that Yang's symptoms were caused by the irritation of a pre-existing lesion. As for Dr. Setty, the court concluded that the physician's testimony was admissible because he was one of Yang's treating physicians and had developed his opinions about her treatment during such care – not in anticipation of litigation. Thus, the defense was not required to disclose his opinions prior to trial, and his opinion testimony regarding the applicable standard of care was admissible. In Case No. A12A0014, Yang appeals from the court's order.

*Case No. A12A0014*

1. Yang contends that the trial court abused its discretion in denying her motion in limine to exclude the expert witness testimony of Dr. Samuels.[2] Yang does not contend that Dr. Samuels, a neurologist, was unqualified to be an expert witness on the issue of causation. Instead, Yang challenges the admissibility of his testimony, arguing that it lacked the requisite relevance and scientific reliability to be admissible

---

[2] "The issue of the admissibility or exclusion of expert testimony rests in the broad discretion of the court, and consequently, the trial court's ruling thereon cannot be reversed absent an abuse of discretion." (Punctuation and footnote omitted.) *Bd. of Regents &c. of Ga. v. Casey*, 300 Ga. App. 850 (686 SE2d 807) (2009).

as an expert opinion under OCGA § 24-9-67.1 (b) and *Daubert v. Merrell Dow Pharmaceuticals.*[3] Specifically, Yang argues that Dr. Samuels allegedly failed to consider her complete medical history; failed to affirmatively testify as to the exact cause of the lesion, instead of simply ruling out possible causes; improperly ignored other possible causes of her pre-injection symptoms; and relied upon a "leap in faith" in concluding that the lesion must have existed prior to the cervical injection, given that the lesion had not been discovered or diagnosed prior to the injection. She also contends that Dr. Samuels' causation testimony was inadmissible because she has never been diagnosed with an autoimmune disorder.

Under OCGA § 24-9-67.1 (b) (2010),[4] a qualified expert witness may offer his or her opinion testimony to help the jury understand the evidence or determine a fact in issue if "(1) [t]he testimony is based upon sufficient facts or data which are or will be admitted into evidence at the hearing or trial; (2) [t]he testimony is the product of reliable principles and methods; and (3) [t]he witness has applied the principles and methods reliably to the facts of the case." In determining whether the expert testimony

---

[3] 509 U. S. 579 (113 SC 2786, 125 LE2d 469) (1993).

[4] We note that the Georgia General Assembly repealed OCGA § 24-9-67.1 in 2011, effective January 1, 2013. Ga. L. 2011, p. 99, § 2.

7

meets the requirements of OCGA § 24-9-67.1 (b), Georgia's courts may look to federal authority, including *Daubert*. OCGA § 24-9-67.1 (f); *Bd. of Regents &c. of Ga. v. Casey*, 300 Ga. App. 850, 851 (686 SE2d 807) (2009). *Daubert*, in turn, states that the trial court has "the task of ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand. Pertinent evidence based on scientifically valid principles will satisfy those demands." *Daubert v. Merrell Dow Pharmaceuticals*, 509 U. S. at 597 (IV). See *Hankla v. Jackson*, 305 Ga. App. at 393 (1) (b) ("Applying the *Daubert* standard, expert testimony is admissible if it is both relevant and reliable.") (punctuation and footnote omitted).

As noted above, the trial court in this case ruled that Dr. Samuels' testimony was admissible because he had applied a scientifically reliable method, differential diagnosis, to the evidence before reaching his conclusions about the issue at the heart of this dispute, i.e., the cause(s) of Yang's cervical lesion and symptoms.

> A differential diagnosis is a method by which a physician determines what caused a patient's symptoms. The physician considers all relevant potential causes of the symptoms and then eliminates alternative causes based on a physical examination, clinical tests, and a thorough case history. This type of analysis meets the requirements of *Daubert* if the expert makes scientifically valid decisions when he determines which potential cause should be ruled in or ruled out as the cause in the specific

8

case. Whether to allow such testimony is made on a case-by-case basis by the [trial] court.

(Punctuation and footnotes omitted.) *Bd. of Regents &c. of Ga. v. Casey*, 300 Ga. App. at 852-853 (2*)*. See also *Hawkins v. OB-GYN Assoc.*, 290 Ga. App. 892, 893 (1) (660 SE2d 835) (2008) ("A 'differential diagnosis' . . . is 'a patient-specific process of elimination that medical practitioners use to identify the most likely cause of an injury from a list of possible causes.'") (citation omitted).

The record in this case shows that Dr. Samuels is an experienced, board-certified neurologist, the director of the Neuroscience Critical Care Division at Emory Healthcare, and the leader of the hospital's monthly morbidity and mortality conferences, during which the hospital's medical staff reviews complications that result in patients' injuries or deaths. In fact, Dr. Samuels is the only expert witness (other than Yang's treating physicians) to testify in this case who is a neurologist. He has extensive experience in diagnosing and treating atypical facial pain, regional pain disorder, multiple sclerosis and other nervous system autoimmune diseases, traumatic injuries to the nervous system, strokes, and complications from nervous system treatments, including those arising from an improper injection into the spinal cord. He

9

also routinely interprets CT and MRI scans during the diagnosis and treatment of his patients.

At trial, Dr. Samuels testified that he had been retained by the defense to determine what may have caused Yang's neurologic issues both before and after the cervical epidural injection. He reviewed Yang's medical history and treatment records, her CT and MRI scans, and the depositions of her treating physicians and expert witnesses[5] before concluding that, in his opinion, her cervical lesion was not the result of an injection of medication into Yang's spinal cord. Dr. Samuels explained that, if Dr. Smith had injected medication into Yang's spinal cord in the cervical area, Yang would have immediately experienced extremely severe pain, would have screamed and/or jerked reflexively on the table, and would have had significantly impaired breathing and difficulty moving her limbs and walking. According to Yang's medical records and the testimony of Dr. Smith and the nurse assisting with the procedure, none of these complications were evident during the procedure, nor did Yang experience a sudden change in her vital signs that would have indicated she was in

---

[5] Notably, these are the same materials that Dr. Stephen Abram and Dr. Gordon Sze, Yang's expert witnesses in anesthesiology and neuroradiology (respectively), reviewed before arriving at their opinions about the possible causes of Yang's spinal cord lesion.

10

extreme pain. In fact, as noted above, Yang was sedated but semi-conscious and able to respond to questions during the procedure. In addition, Dr. Samuels testified that, if medication had been injected into Yang's spinal cord, the fluid would not have spread out (as Yang's lesion appears on her MRI), but would have instead created a bulging pocket of fluid within the cord. The fluid would have then killed the spinal cord's cells, which is inconsistent with subsequent MRIs showing that Yang's lesion became significantly smaller over time.

Dr. Samuels also offered alternative explanations for the presence of the cervical lesion, all of which he deemed much more probable than Yang's theory. Among these explanations was his opinion that, to a reasonable degree of medical probability, a cervical inflammatory lesion was present before Dr. Smith's cervical injection, and the lesion had been caused by a previously undiagnosed autoimmune disorder, such as multiple sclerosis, lupus, sarcoidosis, or similar conditions. According to Dr. Samuels, such inflammation in the upper spinal cord can cause, among other problems, "severe, unrelenting, difficult-to-treat facial pain," which is consistent with the symptoms Yang was experiencing before the cervical injection. He opined that, while Yang's spinal cord lesion may have been irritated by the cervical injection, the injection did not *cause* the lesion, as Yang contends.

11

(a) The record shows that Dr. Samuels, in developing his opinions about the cause(s) of Yang's cervical lesion and her symptoms, applied his medical knowledge and experience with spinal cord injuries and diseases, autoimmune disorders, and other neurological maladies to information obtained from Yang's medical history and records, CT and MRI scans, and the deposition testimony of Yang's treating physicians and expert witnesses. Then, during his deposition and at trial, Dr. Samuels explained in detail how and why he eliminated certain possible causes, found others to be unlikely, and ultimately concluded that the most likely explanation, based on his experience and the evidence before him, was that Yang had a pre-existing inflammatory lesion that had resulted from an undiagnosed autoimmune disorder. Thus, the evidence authorized the trial court to conclude that Dr. Samuels "applied a scientifically reliable method, differential diagnosis, to the evidence before concluding that it was unlikely that the cervical injection had caused the lesion and that, instead, it was more likely that Yang's symptoms were caused by the irritation of a pre-existing lesion." Consequently, the admission of Dr. Samuels' expert opinion testimony was proper under OCGA § 24-9-67.1 (b), and *Daubert*, and we discern no abuse of discretion in the trial court's denial of Yang's motion in limine to exclude

12

such testimony. See *Bd. of Regents &c. of Ga. v. Casey*, 300 Ga. App. at 852-853 (1), (2).

(b) Yang argues that, for his testimony to be admissible, Dr. Samuels not only had to "rule out" potential causes, but also had to "rule in" or prove his own theory of causation. The cases upon which Yang relies for this argument, however, are inapplicable here because they address only the admissibility of the testimony of the *plaintiff's* expert witnesses, i.e, what those witnesses must show in order to meet the *plaintiff's* burden of proving, as part of his or her case-in-chief, that the defendant's negligence caused his or her injuries.[6] Accordingly, Yang's argument lacks merit.

(c) Moreover, we note that Dr. Samuel's testimony about the possibility that Yang had a pre-existing, undiagnosed autoimmune disorder, like multiple sclerosis or lupus, or that there her lesion was caused by something other than an injection of

---

[6] See, e.g., *Hankla v. Jackson*, 305 Ga. App. at 392-395 (1) (b) (i) - (iii) (This Court concluded that the trial court did not abuse its discretion in admitting the testimony of the plaintiff's expert witnesses, because the experts based their opinions of causation on the particular facts of the case and their prior knowledge of the specific injury at issue and, in the process, ruled out other potential causes.); *Hawkins v. OB-GYN Assoc.*, 290 Ga. App. at 893-895 (1) (This Court concluded that the testimony of the plaintiff's expert witness was insufficient to meet the plaintiff's burden of proving causation, because the witness offered only his bare assumption that the alleged negligence was "more probably than not" the cause of the injury and testified that the injury could have been the result of other causes.).

13

medicine into her spinal cord was consistent, if not cumulative, with the testimony of another defense witness, Dr. Richard Rauck, an expert in anesthesia and pain management. Accordingly, even if the admission of Dr. Samuel's testimony was error, it was harmless to the extent that it was merely cumulative of Dr. Rauck's testimony. See *Flowers v. Union Carbide Corp.*, 271 Ga. App. 438, 442-443 (3) (a) (610 SE2d 109) (2005) (The improper admission of evidence is harmless when it is cumulative of other admissible evidence.).

2. Yang challenges the denial of her motion in limine to exclude the testimony of Dr. Setty regarding the applicable standard of care for administering the cervical epidural injection, because Dr. Smith had failed to provide pretrial notice that she intended to present Dr. Setty's expert opinion at trial, as required by OCGA § 9-11-26 (b) (4) (A) (i). Under that statute, a party may "require any other party to identify each person whom the other party expects to call as an expert witness at trial, to state the subject matter on which the expert is expected to testify, and to state the substance of the facts and opinions to which the expert is expected to testify and a summary of the grounds for each opinion." The statute, however, "applies only to experts whose knowledge of the facts and opinions held were acquired or developed in anticipation of litigation or for trial, and not to an expert witness who is in fact an actor or observer

14

of the subject matter of the suit." (Punctuation and footnote omitted.) *Stewart v. Odunukwe*, 273 Ga. App. 380, 381 (615 SE2d 223) (2005). Thus, OCGA § 9-11-26 (b) (4) (A) (i) does not apply to a physician whose knowledge and opinions arose from his own involvement in the plaintiff's medical care. Id. at 381-382.

Further, "[t]he purpose of identifying witnesses [before trial] is to eliminate the possibility of surprise to each party." (Footnote omitted.) *Stewart v. Odunukwe*, 273 Ga. App. at 381. See *Kamensky v. Stacey*, 134 Ga. App. 530, 532 (215 SE2d 294) (1975) ("[W]here the complaining party cannot legitimately claim surprise, either because he knew of the existence of the witness or had equal means of knowing, it is not error to fail to invoke the sanctions of postponement, mistrial, barring the witness, etc.") (citations omitted).

(a) In this case, Dr. Setty was the first physician to examine Yang at GAS, after she had been referred to the facility in 2006. After Dr. Setty examined Yang and reviewed the numerous medications and treatments she had tried for pain relief without success, he made a preliminary diagnosis and an initial treatment plan that called for an injection near Yang's facial nerve to see if it alleviated the pain, with other procedures to follow, if necessary. Therefore, because Dr. Setty was an expert witness whose knowledge and opinions about Yang's medical conditions and

15

treatment needs arose from his involvement as one of her treating physicians (as opposed to an expert witness whose knowledge of the facts and opinions held were solely acquired or developed in anticipation of litigation or for trial), his testimony did not fall within the ambit of OCGA § 9-11-26 (b) (4) (A) (i). *Stewart v. Odunukwe*, 273 Ga. App. at 381-382.

(b) Further, the appellees argue that, even if they should have disclosed Dr. Setty as an expert witness prior to trial, Yang was not prejudiced. We agree.

(i) The record shows that, in the consolidated pretrial order, Yang listed Dr. Setty as a witness that she may call at trial in her case-in-chief. Therefore, Yang cannot legitimately argue that she was surprised by Dr. Smith's decision to call Dr. Setty as a witness at trial. *Kamensky v. Stacey*, 134 Ga. App. at 532.

(ii) In addition, any error in admitting Dr. Setty's testimony was harmless, as it was consistent with and cumulative of the testimony of Dr. Richard Rauck, an expert in anesthesia and pain management. See *Flowers v. Union Carbide Corp.*, 271 Ga. App. at 442-443 (3) (a).

Accordingly, we conclude that Yang has failed to demonstrate any reversible error in the trial court's decision to admit the testimony of Dr. Samuels and Dr. Setty in this case. The trial court's judgment on the jury's verdict is, therefore, affirmed.

16

*Case No. A12A0015*

Pursuant to our decisions in Divisions 1 and 2, supra, the cross-appeal, Case No. A12A0015, is dismissed as moot.

*Judgment in Case No. A12A0014 affirmed. Appeal in Case No. A12A0015 dismissed. Dillard, J., concurs. Phipps, P.J., concurs in judgment.*