**FOURTH DIVISION**
**DILLARD, P. J.,**
**MERCIER and MARKLE, JJ.**

**NOTICE: Motions for reconsideration must be _physically received_ in our clerk's office within ten days of the date of decision to be deemed timely filed.**
**https://www.gaappeals.us/rules**

**August 25, 2022**

# In the Court of Appeals of Georgia

A22A0960. HARVARD et al. v. JOHN D. ARCHBOLD MEMORIAL HOSPITAL, INC. et al.

MARKLE, Judge.

After Donna Harvard suffered a stroke at home, she was treated in the emergency room of John D. Archbold Memorial Hospital, where the attending physician sought a consult with a neurologist from a tele-medicine company the hospital had contracted to provide such services. Donna later suffered a hemorrhage and died, and her husband sued the Hospital and its parent corporation (collectively "the Hospital"), and the tele-medicine company Specialist on Call and Georgia Tele-Physicians (collectively "SOC"), alleging that the failure to timely administer a blood-clot reducing treatment resulted in Donna's hemorrhage.[1] The trial court

---

[1] SOC and Georgia Tele-Physicians are related entities, with SOC handling technical and administrative support, and Georgia Tele-Physicians providing the

granted summary judgment to the Hospital and SOC, finding that Harvard failed to show that any delay in care caused Donna's hemorrhage. Harvard now appeals. For the reasons that follow, we affirm.

> To prevail at summary judgment under OCGA § 9-11-56, the moving party must demonstrate that there is no genuine issue of material fact and that the undisputed facts warrant judgment as a matter of law. An appellate court's review of the grant or denial of summary judgment is de novo, and we view the evidence, and all reasonable conclusions and inferences drawn from it, in the light most favorable to the nonmovant.

(Citations and punctuation omitted.) *Mekoya v. Clancy*, 360 Ga. App. 452 (861 SE2d 409) (2021).

The underlying facts are largely undisputed. The Hospital contracted with SOC to provide video neurological consultations upon request. Under SOC's protocol, the local emergency room physician would identify the need for a consultation and initiate a request through SOC's coordinator. After the coordinator obtained basic information, a nurse would review the information, speak with the hospital to obtain

---

doctors. Harvard also named as defendants the emergency room physician and his practice group, as well as the SOC neurologist who consulted on Donna's case. The trial court granted summary judgment to these defendants, and they are not parties to the appeal

more detailed medical information, such as medications, vital signs, and the onset of stroke symptoms. The nurse would then assign a priority level based on the patient's status and potential for treatment with tPA, a medication used in the treatment of ischemic strokes that is designed to break up blood clots and restore blood flow to the brain.[2] The case then would be placed in a queue to await an assignment to a specific physician. Per the terms of the contract between SOC and the Hospital, once the case was assigned, the physician would begin the consult within 30 minutes. SOC typically would not assign a neurologist until the lab work and CT scan results were available for review because this information was critical to assessing a patient's candidacy for tPA treatment. Generally, tPA must be administered within three hours, but not more than four-and-a-half hours, of onset of the stroke.

Around 11 a.m. one morning in July 2014, Donna's friend noticed that Donna was unable to speak. When her husband returned home an hour later, he brought Donna to the Hospital emergency room, where the nurses noted the possibility of an ischemic stroke and alerted the physician.

---

[2] See Jose Vega, How Tissue Plasminogen Activator (tPA) Works for Stroke, https://www.verywellhealth.com/tissue-plasminogen-activator-tpa-3146225 (last visited July 21, 2022).

The physician examined Donna, and ordered a CT scan and lab work before initiating a neurology consult request with SOC at 1:07 p.m., to determine whether Donna would be a good candidate for tPA treatment. The coordinator at SOC took Donna's information and placed her in the queue. A nurse with SOC then reviewed the information, spoke with the doctor at the Hospital, and sent the information back into a queue to await lab and CT results before assignment to a consulting neurologist. Based on the physician's note that Donna was improving and able to speak, the SOC nurse prioritized her as intermediate instead of high priority.

The attending physician received the lab work and CT scan results around 1:50 p.m., and he communicated those results to SOC. Over the next half hour, however, the physician noted that Donna's ability to speak diminished and she was more confused. Because there had been no further contact from SOC, both the physician and one of the Hospital nurses followed up to expedite the process. SOC assigned Donna's case to a neurologist at 2:56 p.m. The neurologist initiated the video conference three minutes later, and determined that treatment with tPA was appropriate. The neurologist informed Donna and her husband of the risks of tPA treatment, including the possibility of hemorrhaging, and they consented to treatment. The Hospital staff administered the medication at 3:17 p.m., within the extended four-

4

and-a-half-hour treatment window. Tragically, Donna suffered a hemorrhage, and ultimately did not survive.

Donna's husband, Joe Harvard, filed the instant renewal suit against SOC and the Hospital on behalf of himself and as the administrator of Donna's estate (collectively "Harvard"), alleging that the defendants were negligent and that their delay in providing care resulted in a loss of an opportunity to benefit from the tPA treatment. In support of these claims, Harvard attached an affidavit from an expert, Dr. Arthur Pancioli, who opined that the failure to timely treat Donna resulted in a less favorable outcome.

In his subsequent deposition, Dr. Pancioli acknowledged that tPA can be administered up to four-and-a-half hours after onset of symptoms, and that the most common risk of tPA treatment is hemorrhage.[3] He opined that every delay in treatment increased the risks, pointing to studies that show that the difference in the risk for hemorrhage from hour three to hour four-and-a-half increase by .1 percent. He conceded that the chance of hemorrhaging was present even if Donna had been treated with tPA before the three-hour mark expired, given her hypertension.

---

[3] The expert also confirmed that only about 30 percent of patients treated with tPA obtain a favorable outcome.

5

Nevertheless, he stated that SOC and the Hospital breached the standard of care when they delayed the treatment, and this delay limited Donna's opportunity for a better outcome.

SOC and the Hospital moved for summary judgment arguing, as is relevant here, that the expert's testimony failed to establish causation. In support, they submitted the deposition of their expert, Dr. Steven Levine, who agreed that the risk increased by .1 percent when treated four-and-a-half hours after onset of symptoms as opposed to three hours. But he explained that this percentage was not a clinically significant difference, and the delay had essentially no effect on the risk of hemorrhaging. Dr. Levine explained that the loss of chance for a better outcome is relevant to the efficacy of the drug, but is unrelated to the risk of hemorrhage. He then concluded that there was a 99.9 percent chance that Donna would have hemorrhaged even if she had been given the drug earlier. He also pointed to a published study finding that treatment between three- and four-and-a-half hours was not related to a higher rate of hemorrhage.

The trial court granted summary judgment to SOC and the Hospital, finding that there was no evidence the delay in obtaining the consultation and treatment caused the hemorrhage, and Dr. Pancioli's testimony was "too vague to express the

6

kind of reasonable degree of medical certainty or probability necessary to establish causation for a medical-malpractice claim." Harvard now appeals, arguing that the expert testimony established a breach in the standard of care, and that the delay in giving tPA damaged Donna's brain cells, increased the risk of hemorrhage, and denied Donna the chance for a better outcome, all of which are compensable damages. We are not persuaded.

As Harvard explains, he is asserting a claim for negligence based on Donna's injury. To state a claim for negligence, Harvard must show a breach of the standard of care that caused damages. *Walker v. Giles*, 276 Ga. App. 632, 638 (624 SE2d 191) (2005).

As we have explained,

[a] plaintiff cannot recover for medical malpractice, even where there is evidence of negligence, unless the plaintiff establishes by a preponderance of the evidence that the negligence either proximately caused or contributed to cause plaintiff harm. To meet this burden, a medical malpractice plaintiff must present expert testimony because the question of whether the alleged professional negligence caused the plaintiff's injury is generally one for specialized expert knowledge beyond the ken of the average layperson. Ultimately, the causation evidence must rise above mere chance, possibility, or speculation. . . . A plaintiff . . . must prove that the injuries complained of proximately

7

resulted from such want of care or skill. A bare possibility of such result is not sufficient. There can be no recovery where there is no showing to any reasonable degree of medical certainty that the injuries could have been avoided.

(Citations and punctuation omitted.) *Edokpolor v. Grady Mem. Hosp. Corp.*, 347 Ga. App. 285, 287 (1) (819 SE2d 92) (2018); see also *Mekoya*, 360 Ga. App. at 462 (2); *Swint v. Mae*, 340 Ga. App. 480, 482 (1) (798 SE2d 23) (2017) ("The expert must state his or her opinion regarding proximate causation in terms stronger than that of medical possibility[.]"); *MCG Health v. Barton*, 285 Ga. App. 577, 582 (2) (647 SE2d 81) (2007) ("A mere showing of negligence without proof of causation is insufficient to withstand summary judgment. Furthermore, medical causation must be proved to a reasonable degree of medical certainty and cannot be based on mere speculation.") (citation and punctuation omitted).

Contrary to Harvard's assertions, the question in this appeal is not whether Donna lost the chance of a better outcome due to the delay.[4] Instead, the issue on

---

[4] In an effort to clarify the issue before this Court, Harvard concedes that his expert could not say that Donna more likely than not would have had a better outcome with timely treatment. Thus, he explains, he is not arguing that Donna would have benefitted from receiving tPA in a more timely manner or that the delay in treatment caused the hemorrhage. Instead, his argument is that the delay in treatment caused damage to brain cells and made it more likely that she would hemorrhage, and

appeal is whether Harvard met his burden to raise a factual question regarding causation. Like the trial court, we conclude that he has not.

> When causation is involved, plaintiff has a more complex dilemma where the defendant has given expert testimony that there was no proximate cause, because to merely show a causal link does not refute the defendant's denial of causation and leaves an examination upon the entire record that the evidence does not create a triable issue as to the essential elements of causation, requiring the grant of summary judgment.

(Citation omitted.) *Roberts v. Nessim*, 297 Ga. App. 278, 282 (2) (a) (ii) (676 SE2d 734) (2009); see also *Pneumo Abex, LLC v. Long*, 357 Ga. App. 17, 24 (1) (a) (849 SE2d 746) (2020) ("[t]here must be a realistic assessment of the likelihood that the alleged negligence caused the injury or death. Indeed, perhaps nothing in medicine is absolutely certain, but the law intends that if the plaintiff's medical expert cannot form an opinion with sufficient certainty so as to make a medical judgment, there is nothing on the record with which a jury can make a decision with sufficient certainty so as to make a legal judgment.") (citation and punctuation omitted).

---

her estate and her husband are entitled to damages from this injury. Pretermitting whether he raised this precise argument in the trial court, there is no medical evidence to support this theory of causation, as none of Dr. Pancioli's testimony reached this conclusion.

Here, both experts agreed that hemorrhage was a potential risk of tPA treatment, and that there was no clinically significant increase in risk whether the treatment was administered at hour three or hour four-and-a-half. Although Harvard's expert opined that every minute of delay would increase the risk, he also admitted that Donna could have suffered a hemorrhage even if she had received the tPA before the expiration of the three hours, and he acknowledged that Donna was at a higher risk for hemorrhage due to hypertension. But, at no point in his deposition did the expert find with any reasonable degree of medical certainty that Donna would not have suffered the hemorrhage had the tPA been administered more quickly. *Beasley v. Northside Hosp.*, 289 Ga. App. 685, 689 (658 SE2d 233) (2008) ("There can be no recovery [in a medical malpractice action] where there is no showing to any reasonable degree of medical certainty that the injuries could have been avoided."); see also *Pneumo Abex*, 357 Ga. App. at 24 (1) (a); *Swint*, 340 Ga. App. at 484 (1).

Indeed, as Dr. Levine explained, the .1 percent increase in risk was not a clinically significant difference, and any delay in treatment did not impact the likelihood that Donna would suffer a hemorrhage. Harvard presented no evidence to dispute this opinion, and there is simply no evidence — other than the expert's speculation — to support Harvard's causation argument. See *Edokpolor*, 347 Ga.

10

App. at 287-288 (1) (expert's conclusory and speculative testimony regarding causation could not defeat summary judgment); see also *Roberts*, 297 Ga. App. at 282-283 (1) (a) (ii) (no genuine issue of material fact based on conclusory and unsupported expert affidavit in medical malpractice case); *MCG Health*, 285 Ga. App. at 582 (2) (causation must be shown by more than speculation). As a result, the trial court properly concluded that Harvard failed to establish causation, and SOC and the Hospital were entitled to summary judgment.[5]

*Judgment affirmed. Dillard, P. J., and Mercier, J., concur.*

---

[5] Having concluded that Harvard failed to establish causation, we need not address the loss of chance or the proper determination of damages arguments.

11