**FIFTH DIVISION**
**BARNES, P. J.,**
**MCFADDEN, P. J., and PIPKIN, J.**

NOTICE: Motions for reconsideration must be *physically received* in our clerk's office within ten days of the date of decision to be deemed timely filed.
https://www.gaappeals.us/rules

June 17, 2025

# In the Court of Appeals of Georgia

A25A0223. SCOTTMAN et al. v. EMORY HEALTHCARE, INC.

PIPKIN, Judge.

In this professional negligence case, Appellants Mike Scottman and Nicole Johnson (collectively "Appellants") appeal the grant of summary judgment to Appellee Emory Healthcare ("Emory"). For the reasons set forth below, we affirm.

1. When viewed in the appropriate light, see *Reddy v. Belton*, 372 Ga. App. 574, 574 (905 SE2d 324) (2024), the record shows as follows. On the morning of January 6, 2020, Appellants' son, J. S., was a patient in the Neonatal Intensive Care Unit ("NICU") at Emory University Hospital Midtown; he was being cared for by Registered Nurse Katherine Ulrich, an Emory employee, who had only worked as a NICU nurse for approximately six months. At that time, "Total Parenteral Nutrition (TPN) and [l]ipid fat emulsion (IL) [were] infusing" through an intravenous line

("IV") placed at the top of J. S.'s left forearm. According to medical records, Nurse Ulrich inspected J. S.'s IV site at 6:00 a.m., as well as 7:00 a.m., and she reported that the site was "dry and intact" and had "no redness[,] swelling[,] or drainage." However, around the time of the nursing shift change – approximately 7:25 a.m. – a different nurse observed that the IV site was "swollen, . . . red[,] and inflamed." At 7:40 a.m., Nurse Ulrich documented that J. S.'s IV site was "swollen" and "leaking"; then, at 8:25 a.m., an IV infiltration was documented in the medical records.

Appellant Johnson learned of the infiltration through a telephone call with the medical staff. In that call, she learned that the infiltration resulted in "full thickness burns/third-degree burns," that J. S. would require significant subsequent medical intervention – including a skin graft – and that the injury would likely result in "contracture and deformities of some sort that [J. S. would] develop as he goes through different stages of growth." Appellant Johnson later learned that Nurse Ulrich was "sorry" for the incident and that Nurse Ulrich would get "more training."

Appellants filed suit against Emory in January 2022, apparently without the benefit of the entirety of J. S.'s medical records. The January 2022 complaint alleges that Nurse Ulrich "failed to comply with the applicable standard of care by not making hourly observations on J. S." and by "failing to make proper notes in the hospital

system documenting her observations of J. S." According to the complaint, "it was foreseeable that an IV infiltration could occur and cause physical damage" and that "consistent observations of J. S.'s IV could have lead to earlier detection of an IV infiltrate and resulted in less serious physical injury." Appellants' complaint identified "Barbara Camper, RN, [as] an expert witness who is competent to testify as to the standard of care required of [Nurse Ulrich]." In her affidavit, Nurse Camper opined that the care provided by Nurse Ulrich

> fell below the standard of care applicable to the circumstances and conditions then existing as follows: 1) In the NICU, a nurse should be trained in the care of neonates and infants. [Nurse Ulrich] was new to the NICU; 2) the standard of care for IV maintenance is to electronically document IV maintenance hourly whereas [Nurse Ulrich] did not make any observation notes regarding any observations; 3) hourly observations and notes should include observations [of] any swelling, redness or leaking around the site, rate of infusion and what is infusing through the IV. It was foreseeable that an infiltration could occur and if observed sooner and caught quickly could have reduced serious injury; 4) hourly and consistent checks would indicate the patency of the IV which would have resulted in earlier detection on the IV infiltration and less serious physical injury.

Emory subsequently answered and denied Appellants' allegations, noting that the relevant medical records "speak for themselves" and contradict the complaint. Following a pre-trial hearing in late 2023, the trial court granted Appellants a third and "*FINAL* extension of discovery" and scheduled the parties for a another pre-trial hearing. (Emphasis in original.)

In February 2024, approximately one month after the extended discovery window had closed, Emory moved for summary judgment. In its motion, Emory explained that the basis of Appellants' suit was the "allegedly negligent monitoring of an IV in the hand of J. S.," specifically, that Nurse Ulrich had "failed to comply with the applicable standard of care by not making hourly observations on J. S." However, according to Emory, the relevant nursing notes -- which had been supplied to Appellants almost two years prior to the motion and were attached to Emory's motion -- plainly contradicted Appellants' theory of the case. Emory argued that, despite the records undermining Appellants' factual position and despite Appellants being granted additional time for discovery, Appellants had refused to dismiss the case or to articulate a new theory of negligence; Emory also noted that Appellants had failed to identify a causation expert. Finally, Emory contended that any new theory of

negligence asserted in response to the motion for summary judgment should be barred as untimely.

After being granted an extension of time, Appellants filed a response to Emory's motion. In their motion, Appellants cast doubt on the veracity of the records and argued that, even if the medical records were accurate, "there still remains the question of whether [Nurse Ulrich] adhered to the applicable standard of care." As to the records, Appellants asserted that, since the filing of the complaint, they had been attempting to get the complete medical records but that the nursing notes were always missing from the records; according to Appellants, the nursing notes were finally produced in May 2022 and "magically" showed that Nurse Ulrich checked J. S.'s IV site every hour. As to their theory of negligence, Appellants then theorized, for the first time, that J. S.'s injuries would have taken at least an hour to occur and, consequently, that Nurse Ulrich's purported IV checks "missed the infiltration [thereby] violating the applicable duty of care which was the proximate cause of J. S.'s burn injuries." Appellants supported their motion with, among other things, photographs of J. S.'s wound and a new affidavit from Nurse Camper. In her revised affidavit, Nurse Camper opined that "[t]he type of injury suffered by J. S. from his IV infiltration takes more than an hour . . . to occur. If the nurse observed J. S. at 0600 and 0700 as stated in the

nurse's notes, then the nurse missed the infiltration," which, Nurse Camper continued, "violated the applicable standard of medical care and was the proximate cause of the injuries he suffered."

In response, Emory challenged Appellants' characterization of the evidence, their legal theory, as well as Nurse Camper's affidavits. Specifically, Emory asserted that Appellants could not defeat the motion for summary judgment by merely asserting "baseless speculation that the medical records that disprove their claim were fabricated," that Nurse Camper's opinion lacked probative value because the medical records on which she was relying to form her opinion were not attached to her affidavit, that Nurse Camper's affidavit lacked any indication of her qualification to render an opinion as to causation, that Nurse Camper was testifying outside her area of expertise by opining as to causation, and, finally, that Nurse Camper's new affidavit was untimely and should be struck.

Following a hearing, at which the trial court orally granted Emory's motion for summary judgment, Appellants attempted to dismiss their suit without prejudice. In subsequent written orders, the trial court struck Appellants' attempt to voluntarily dismiss their suit and memorialized its ruling on summary judgment. In a detailed order granting the motion for summary judgment, the trial court offered alternative

bases for granting the motion: a lack of evidence and the inadequacy of Appellants' expert testimony.

The trial court first concluded that there was an absence of evidence that Nurse Ulrich did not conduct the requisite hourly checks; the trial court explained that, while Appellants had "expressed doubt about the validity" of the nursing notes, the "medical records show that the checks did occur" and that Appellants had not "point[ed] to any specific evidence that contradicts [those] records."

The trial court also concluded that Appellants "had failed to demonstrate, by expert testimony, that any violation of the applicable standard of care was the proximate cause of the alleged injury." This ruling, too, was multifaceted and supported with alternative legal conclusions. The trial court first ruled that neither of Nurse Camper's affidavits had probative value because there were no records attached to the affidavits as required by OCGA § 9-11-56 (e). The trial court alternatively ruled that Appellants had failed to demonstrate that Nurse Camper was qualified to render an opinion as to causation; the trial court explained that the expert's affidavit "does not provide any explanation of how her knowledge, skill, experience, training or education qualifies her to render [her] opinion." In yet another alternative conclusion, the trial court ruled that, even if Nurse Camper's affidavit were facially sufficient and

even if she were competent to offer opinion testimony as to causation, the affidavit was untimely and due to be struck as a discovery sanction pursuant to OCGA § 9-11-37 (d).

Appellants now challenge the grant of summary judgment on appeal. While Appellants assert four enumerations of errors purportedly challenging each of the trial court's alternative conclusions, we need not address each argument; as explained below, the trial court may be affirmed on at least two different grounds.

2. Appellants assert on appeal, among other things, that the trial court improperly disallowed Nurse Camper's affidavits. We review Appellants' challenges to the trial court's ruling on Nurse Camper's affidavits for abuse of discretion. See *MCG Health v. Barton*, 285 Ga. App. 577, 580 (1) (647 SE2d 81) (2007).

(a) Appellants first challenge the trial court's conclusion that Nurse Camper's affidavits lacked probative value because "the records upon which [her] opinions rely were not attached to the affidavit." There is no merit to this challenge.

In relevant part, OCGA § 9-11-56 (e) provides as follows:

[s]upporting and opposing affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in the evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein. *Sworn or certified copies of all papers*

*or parts thereof referred to in an affidavit shall be attached thereto or served therewith.*

(Emphasis supplied.) Appellants seemingly recognize that there were no records attached to Nurse Camper's affidavits, but they assert that this "omission . . . is not an automatic preclusion of the affidavit in a summary judgment analysis if the certified records are part of the record and before the court." While Appellants are correct that the above-quoted requirement from OCGA § 9-11-56 (e) "has been relaxed somewhat for the practical purpose of avoiding duplication by allowing clear identification of records already on file," *Williams v. Hajosy*, 210 Ga. App. 637, 638 (2) (436 SE2d 716) (1993), this exception does not apply here because the medical records referenced by Nurse Camper are not included in the record.[1]

Instead, affidavit testimony reflects that J. S.'s medical record from Emory consists of over 800 pages; however, only two pages of those records were put before the trial court and included in the trial record, namely, two pages of nursing notes

---

[1] It appears that the exception on which Appellants rely was created by this Court approximately 40 years ago without regard for the plain language of OCGA § 9-11-56 (e) and without the benefit of meaningful legal analysis or citation to legal authority. See *Jones v. Rodzewicz*, 165 Ga. App. 635, 637 (4) (302 SE2d 402) (1983). That said, we must leave the viability of this "exception" for another day.

related to the hourly inspections of J. S.'s IV site.[2] That said, those two pages of nursing notes were not in the record at the time of Nurse Camper's initial affidavit; in fact, at the time that Nurse Camper's initial affidavit was sworn and filed -- January 2022 -- Appellants admittedly were not in possession of the nursing notes. Consequently, Nurse Camper's initial affidavit -- which was premised on "records provided to [her] in connection with the care and treatment rendered to J. S. at Emory Hospital Midtown" -- must refer to medical records *other* than the nursing notes and, thus records *other* than those available in the record.

Likewise, while Nurse Camper's second affidavit mentions that she "reviewed" the nursing notes -- and thereafter recites the time line found in those records -- she expressly states that her opinions as to the alleged violation of the standard of care and as to proximate cause were, again, premised on her review of "J. S.'s *medical records*." Consequently, the "relaxed" version of OCGA § 9-11-56 (e) on which Appellants seek

---

[2] The record also includes numerous pictures of J. S.'s wounds. While the record suggests that these photographs were taken by a medical provider, it appears that the photographs were captured using the providers' personal cellular telephone; there is no indication in the record that those photographs were made part of -- or were pulled from -- J. S.'s medical records.

to rely is inapplicable here; thus, the trial court did not err in excluding her affidavits when deciding Emory's motion for summary judgment.

(b) Appellants also assert that the trial court erred in concluding that they had failed to demonstrate that Nurse Camper was qualified to testify as an expert. However, as discussed below, we agree with this alternative conclusion; consequently, we hold that the trial court may be affirmed on this basis, too.

(i) As an initial matter, we disagree with Appellants that the record shows that Nurse Camper's affidavits satisfy the requirements of OCGA § 24-7-702.[3] While Nurse Camper's initial affidavit reflects that she was licensed as a registered nurse at the time of the affidavit and has "worked" in that capacity since 1980, her affidavit does not expressly indicate, as required by OCGA § 24-7-702 (c) (1), that she was so licensed at the time of the incident in January 2020. Likewise, her affidavit fails to satisfy OCGA § 24-7-702 (c) (2) (A), which provides that an expert's opinion is only admissible if

---

[3] While Emory is correct that the trial court did not specifically address this argument, we may nonetheless consider this issue as part of our de novo review of the grant of summary judgment. See, e.g., *Porquez v. Washington*, 268 Ga. 649, 652 (2) (492 SE2d 665) (1997)

at the time the act or omission is alleged to have occurred, such expert . . . had actual professional knowledge and experience in the area of practice . . . in which the opinion is to be given as the result of having been regularly engaged in . . . [t]he active practice of such area of specialty of [her] profession for at least three of the last five years, with sufficient frequency to establish an appropriate level of knowledge . . . in performing the procedure, diagnosing the condition, or rendering the treatment which is alleged to have been performed or rendered negligently by the defendant whose conduct is at issue[.]

Aside from Nurse Camper's statement that she has "worked as an RN since 1980," she states only that "I served as a licensed registered Primary Nurse Clinician at Emory Hospital Midtown in the [NICU] since 1985." (As in original.) She then briefly explains that she "was responsible for observing and assessing infants during care in NICU, making nurse's notes in the hospital system regarding any infants under [her] care, IV insertions, IV maintenance, medical administration and other charge nurse responsibilities." Thus, while it is clear that Nurse Camper has been employed as a NICU nurse in some capacity since 1980, her affidavit fails to account for the last five years or to establish the frequency with which she has engaged in NICU nursing or practiced with IV lines.

Consequently, the trial court properly concluded that Nurse Camper was unqualified to render expert testimony in this case. See *Zarate-Martinez v. Echemendia*, 299 Ga. 301, 312 (3) (788 SE2d 405) (2016) (expert affidavit insufficient because it "contain[ed] no statement indicating that [the expert] had been in active practice for at least three of the last five years prior to the alleged negligent act"); *Dawson v. Leder*, 294 Ga. App. 717, 720 (1) (669 SE2d 720) (2008) (vague assertions of competency regarding skills related to negligent act insufficient to establish that expert "practiced in the [relevant] area with sufficient frequency to establish an appropriate level of knowledge").

(ii) Finally, even if Nurse Camper were qualified under OCGA § 24-7-702 to offer testimony concerning the standard of care in this case, we agree with the trial court that she has failed to establish that she is competent to opine as to causation.

"[A] plaintiff cannot recover for medical malpractice, even where there is evidence of negligence, unless the plaintiff establishes by a preponderance of the evidence that the negligence either proximately caused or contributed to cause plaintiff harm." (Citation and punctuation omitted.) *Zwiren v. Thompson*, 276 Ga. 498, 500 (578 SE2d 862) (2003). To make the required showing of proximate cause in a medical professional negligence case,

13

[t]he plaintiff must use expert testimony because the question of whether the alleged professional negligence caused the plaintiff's injury is generally one for specialized expert knowledge beyond the ken of the average layperson.[4] Using the specialized knowledge and training of his field, the expert's role is to present to the jury a realistic assessment of the likelihood that the defendant's alleged negligence caused the plaintiff's injury.

(Citation omitted.) *Allen v. Family Med. Center*, 287 Ga. App. 522, 524 (1) (652 SE2d 173) (2007). Further, "[a]n expert must have knowledge suitable or fitting for the rendering of the particular opinions to which the expert proposes to testify," (citation omitted.) *Howell v. Cochran*, 365 Ga. App. 80, 86 (a) (877 SE2d 625) (2022); thus, "it is axiomatic that no expert can testify outside the limits of [her] area of expertise." *Chybicki v. Coffee Regional Med. Center*, 361 Ga. App. 654, 664 (2) (865 SE2d 259) (2021).

Here, Appellants assert that "[t]he reason for J. S.'s injuries is the failure of [Nurse Ulrich] to identify [the] IV infiltration, which falls squarely within the expertise of a registered nurse like Nurse Camper." However, as Emory points out, the question

---

[4] Appellants do not argue that "the causal link between the defendant's conduct and [J. S.'s] injury can be determined by a lay jury without expert guidance" and, consequently, that "no expert evidence need be produced." (Citation omitted.) *Zephaniah v. Georgia Clinic*, 368 Ga. App. 325, 329 (3) (890 SE2d 86) (2023).

as to causation is *not* whether Nurse Ulrich failed to recognize an infiltration, but instead, whether -- with a reasonable degree of medical certainty -- Nurse Ulrich's failure to detect the infiltration at an earlier time was the proximate cause of J. S.'s injury.

As to this point, Nurse Camper has opined that an IV infiltration "takes more than an hour . . . to occur" and that Nurse Ulrich "missing the IV infiltration . . . violated the applicable standard of medical care and was the proximate cause of the injuries [J. S.] suffered." But, as the trial court correctly explained in its order, Nurse Camper's affidavits fail to detail "how her knowledge, skill, experience, training, or education qualifies her to render these opinions."[5] At most, her affidavits aver that, at some unidentified point in her lengthy career, she was "responsible for . . . IV insertions [and] IV maintenance" and that she is broadly "familiar with infant IV procedures and . . . observ[ing] an infant IV." Noticeably lacking from the affidavits is any reference to her knowledge, skill, experience, training, or education concerning

---

[5] As Emory correctly points out in its brief, Appellants' appellate argument focuses on whether Nurse Camper, as a non-physician, was qualified to offer an opinion on causation *generally* rather that the trial court's determination that, under the facts of this case, Nurse Camper has not been shown to be qualified to offer causation opinion on IV infiltration.

recognizing or responding to IV infiltration or the consequences of such an event. As such, we agree with the trial court that Appellants have failed to show that Nurse Camper is qualified to render an expert opinion as to causation. Compare *Allen*, 287 Ga. App. at 526 (2) (registered nurse qualified to render expert testimony regarding "intramuscular injection of steroid" where affidavit included extensive detail concerning the standard of care concerning the administration of such an injection and averred that "during the course of her own daily nursing duties over the past fifteen years, she has given approximately three to five intramuscular injections per day").

Accordingly, the trial court correctly discounted Nurse Camper's expert affidavits and, in the absence of those affidavits, there is insufficient evidence for Appellants to defeat Emory's motion for summary judgment. See, e.g., *Edokpolor v. Grady Mem. Hosp.*, 347 Ga. App. 285, 287 (1) (819 SE2d 92) (2018). Therefore, the judgment of the trial court is affirmed.

*Judgment affirmed. Barnes, P. J., and McFadden, P. J., concur.*